# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-035

Filing Date: June 23, 2009

Docket No. 31,202

STATE OF NEW MEXICO,

   Plaintiff-Respondent,

v.

JULIO CHAVEZ,

   Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
James Waylon Counts, District Judge

Hugh W. Dangler, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Petitioner

Gary K. King, Attorney General
Anita Carlson, Assistant Attorney General
Santa Fe, NM

for Respondent

## OPINION

**BOSSON, Justice.**

**{1}**     When Defendant Julio Chavez woke up on the morning of October 2, 2003, he discovered that his infant daughter, Shelby, was not breathing. Despite repeated efforts, she could not be revived. A police investigation into her death revealed that Shelby had been placed to sleep in a dresser drawer filled with blankets and padding because her bassinet had broken a day or two earlier. In addition, police inspected Defendant's home and discovered impoverished and dirty living conditions that, in the State's opinion, posed a significant danger to Shelby and her two young brothers, Juan and Leo. As a result, Defendant was

1

charged with two counts of child abuse by endangerment with respect to the two boys based on the living conditions in his home. Defendant was charged with one count of child abuse resulting in death in regard to Shelby, as well as a lesser included charge of child endangerment for Shelby. The jury did not find Defendant guilty of child abuse resulting in death but did find Defendant guilty of all three endangerment charges.

{2}     In this appeal, we first explore the sufficiency and nature of the evidence necessary to sustain a child endangerment conviction when it is based only on filthy living conditions and without any underlying criminal conduct. This is not the first time we have confronted this question. We refer to our recent holding in *State v. Jensen*, 2006-NMSC-045, ¶ 14, 140 N.M. 416, 143 P.3d 178, where we stated that "[w]hen filthy living conditions provide the exclusive basis for charging a defendant with child endangerment, the State must assist the trier of fact with evidence that supports a finding that there is a reasonable probability or possibility that such filthy conditions endangered the child." Although we ultimately upheld the endangerment conviction in *Jensen*, we based our decision on a number of risk factors, including criminal activity coupled with the conditions in the home. This is the first case in which filthy conditions alone provide the basis for the conviction. We conclude that the evidence presented at trial was insufficient to support a finding that Defendant's conduct created a substantial and foreseeable risk of harm to the children. Whether a defendant's conduct creates a substantial and foreseeable risk of harm is what determines whether the child was endangered. As we will explain, we no longer find the terms "probability" or "possibility" helpful to our analysis and their use should be discontinued.

{3}     In addition, we address whether the sleeping environment for baby Shelby created a substantial and foreseeable risk of harm sufficient to support a criminal child endangerment conviction. For the reasons we discuss in more detail below, the evidence did not establish that the risk of harm was substantial and foreseeable, and therefore, we reverse. The Court of Appeals having decided otherwise, we reverse.

**BACKGROUND**

{4}     Defendant and Jennifer Wheeler had three children together over the course of their eight-year relationship: Juan and Leo, ages four and two, and Shelby, who was five months old at the time of her death on October 2, 2003. In April 2003, shortly after Shelby was born, the family relocated from Alamogordo to a mobile home in Tularosa. Jennifer worked long hours, leaving Defendant to stay at home with the children.

{5}     On October 1 or the day before, Shelby's bassinet broke. Defendant planned to get a crib for Shelby from his mother, but in the meantime he fashioned a temporary bed for Shelby by placing a 29-by-15 inch dresser drawer on the bedroom floor filled with a pillow, a sheet, and a blanket for padding. That night, Jennifer laid Shelby in the drawer bed to sleep. Shelby awoke around 5:00 a.m. and Jennifer and Defendant placed Shelby back to sleep on her stomach in the drawer. When Defendant woke up hours later, he discovered that Shelby was not breathing and frantically sought help. Resuscitation efforts were

2

ultimately unsuccessful.

**{6}** At the hospital police interviewed Defendant and Jennifer, and later that afternoon went to inspect their home. One officer created a videotape of what he saw, which was played for the jury at trial. Several witnesses catalogued the unsafe and unsanitary conditions in and around the home, including the presence of rodent droppings in various places in the house, such as the cabinets where the dishes were stored and in Shelby's makeshift drawer bed. The home had no gas utility or hot water because the propane tank was empty and disconnected. Dirty clothes were scattered throughout the house; a strong-smelling bag of dirty diapers was left on the floor in the master bedroom next to the drawer bed, and there was a bowl of curdled milk on the floor in the kitchen. Outside, the yard contained a trash pit rife with flies and a pungent odor.

**{7}** The home was also in need of repair and maintenance. The ceiling tiles were stained and starting to grow mold, evidencing a water leak, and one area of the ceiling in the living room appeared ready to collapse. The smoke detector had been disabled and was without a battery. The shower leaked and appeared to have mold, and a razor was left out in the bathroom where it might have been accessible to the children. Outside the home, where the children would run around barefoot and in diapers, there were glass shards from a broken window and a collapsed shed that contained exposed, rusty nails sticking out of lumber on the ground. The ramp leading to the front door of the mobile home contained a gap of several inches. There were also open cans of solvents or cleaners on the porch.

**{8}** On a positive note, the refrigerator contained fresh milk and cheese, and the record indicates that the children were physically healthy and well-nourished. There was no evidence of drugs or alcohol in the home. Jennifer Wheeler testified that Defendant never used drugs and rarely consumed alcohol, and in fact he had helped her stop using drugs when they met.

**{9}** On these facts, the State charged Defendant with one count of child abuse resulting in death and three counts of child abuse by endangerment, one count for each child. After a three-day trial which focused on Shelby's death, the jury acquitted on the charge of child abuse resulting in death, but convicted Defendant of the three endangerment counts, including the count pertaining to Shelby. The Court of Appeals reversed one of the three convictions, holding that Defendant's abuse of his two sons occurred as a single course of conduct stemming from the conditions in the home and constituted only one violation of the statute. *State v. Chavez*, 2008-NMCA-126, ¶ 19, 145 N.M. 11, 193 P.3d 558. However, the Court held that the drawer bed presented a danger unique to baby Shelby and was sufficient to support a second, separate conviction for child endangerment. *Id.* ¶ 20. On certiorari, Defendant argues that the conditions in his home, including the makeshift bed he fashioned for his daughter, were the result of the family's poverty and did not endanger his children within the meaning of our child abuse statute.

**DISCUSSION**

3

**Standard of Review**

**{10}** To the extent Defendant asks us to interpret our criminal child abuse statute, that presents a question of law which is reviewed de novo on appeal. *See State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 24, 137 N.M. 687, 114 P.3d 367 (citing *State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995)). A statute defining criminal conduct must be strictly construed. *Santillanes v. State*, 115 N.M. 215, 221, 849 P.2d 358, 364 (1993). "A criminal statute may not be applied beyond its intended scope, and it is a fundamental rule of constitutional law that crimes must be defined with appropriate definiteness." *Id.* (citing *State v. Bybee*, 109 N.M. 44, 46, 781 P.2d 316, 318 (Ct. App. 1989)).

**{11}** After reviewing the statutory standard, we apply a substantial evidence standard to review the sufficiency of the evidence at trial. *State v. Treadway*, 2006-NMSC-008, ¶ 7, 139 N.M. 167, 130 P.3d 746. "'[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992) (alteration in original) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In performing this review, we must view the evidence in the "light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "The reviewing court does not weigh the evidence or substitute its judgment for that of the fact finder as long as there is sufficient evidence to support the verdict." *State v. Mora*, 1997-NMSC-060, ¶ 27, 124 N.M. 346, 950 P.2d 789.

**Child Abuse and Neglect**

**{12}** Given the special recognition of the needs of children and their inability to protect themselves, our Legislature has adopted a framework of both criminal and civil laws to address child abuse. *State v. Graham*, 2005-NMSC-004, ¶ 9, 137 N.M. 197, 109 P.3d 285. Recognizing the wide variety of ways that a child can be harmed by abuse and neglect, our Legislature has empowered the State with a broad array of civil remedies, ranging from the benign, like ensuring that children receive nutritious meals, to the intrusive, such as placement of children in foster care or termination of parental rights altogether. *See* NMSA 1978, § 32A-4-22(B) (2005). On the far end of this spectrum lies the sanction for criminal child abuse, which classifies abuse as, at a minimum, a third-degree felony punishable by up to three years imprisonment. NMSA 1978, § 30-6-1(D)-(E) (2005). As a practical matter, criminal convictions for child abuse may also lead to the loss of parental rights over those children.

**{13}** On the civil side, the Legislature has enabled the State to act preemptively to protect children "based upon perceived future harm." *Shawna C.*, 2005-NMCA-066, ¶ 26. The civil process addresses situations in which the child "*has suffered or who is at risk of suffering*

4

*serious* harm because of the action or inaction of the child's parent, guardian or custodian." NMSA 1978, § 32A-4-2(B)(1) (1999) (emphasis added). Our Court of Appeals recently stated that when evaluating abuse and neglect cases,

> we emphasize that the focus should be on the acts or omissions of the parents in their caretaking function and not on apparent shortcomings of a given parent due to his or her unfavorable status. While no child would ask to have a poor, incarcerated, or addicted parent, poverty, incarceration, or addiction alone do not perforce equate to neglect as set out in the [civil] statute.

*Shawna C.*, 2005-NMCA-066, ¶ 30.

**{14}** When parental conduct or the home environment places a child at risk, the State can use its civil powers to remove the danger to the child, either by allowing the child to remain with the parents subject to their compliance with court-ordered conditions, by removing the child from the home, or by transferring legal custody to another. *See* § 32A-4-22(B). Importantly, this process contemplates that parents will be afforded advance notice and an opportunity to comply with a treatment plan before the State proceeds to more drastic remedies. *See* § 32A-4-22(C). Parents will have a reasonable opportunity to improve their parenting skills, with the ultimate goal being to preserve and reunify the family.

**Criminal Child Abuse by Endangerment**

**{15}** Our Legislature has also fashioned a parallel criminal scheme to punish conduct that endangers a child. A third-degree felony, child abuse by endangerment occurs when an adult knowingly, intentionally, or negligently places a child "in a situation that may endanger the child's life or health." Section 30-6-1(D)-(E). Child abuse by endangerment, as opposed to physical abuse of a child, is a special classification designed to address situations where an accused's conduct exposes a child to a significant *risk* of harm, "even though the child does not suffer a physical injury." *State v. Ungarten*, 115 N.M. 607, 609, 856 P.2d 569, 571 (Ct. App. 1993). Under this standard, an accused's culpability is premised upon the degree of danger created by his conduct.

**{16}** Taken literally, our endangerment statute could be read broadly to permit prosecution for any conduct, however remote the risk, that "*may* endanger [a] child's life or health." However, by classifying child endangerment as a third-degree felony, our Legislature anticipated that criminal prosecution would be reserved for the most serious occurrences, and not for minor or theoretical dangers. *See Santillanes*, 115 N.M. at 222, 849 P.2d at 365 (criminal prosecutions are for "conduct that is morally culpable, not merely inadvertent."). Therefore, we have taken a more restrictive view of the endangerment statute, and have interpreted the phrase "*may* endanger" to require a "reasonable probability or possibility that the child will be endangered." *Ungarten*, 115 N.M. at 609, 856 P.2d at 571; *see also State v. McGruder*, 1997-NMSC-023, ¶ 37, 123 N.M. 302, 940 P.2d 150 (applying *Ungarten* "reasonable probability or possibility" test).

5

**{17}** New Mexico courts have evaluated child endangerment under the "reasonable probability or possibility" standard for the past sixteen years. In application, however, this standard has created uncertainty in child endangerment cases because "probability" and "possibility" connote two different levels of risk. "Probability" conveys a certain likelihood that a result will occur, whereas "possibility" means that something is merely capable of occurring. As an unintended consequence, our use of both terms to define endangerment has left unclear the amount or degree of risk necessary to support a conviction. We therefore take this opportunity to examine whether we should employ a more precise terminology in describing the degree of risk to which a child must be exposed before it can constitute criminal child endangerment.

**{18}** Although "may" is defined as "a possibility," our concerns for adequate notice and fairness to the accused suggest that the relevant conduct must create more than a "possibility" of harm before it may be punished as a felony. *Shawna C.*, 2005-NMCA-066, ¶ 34 ("In assessing whether a statute provides adequate notice, we ask if the statute 'allows individuals of ordinary intelligence a fair opportunity to determine whether their conduct is prohibited.'" (quoting *State v. Laguna*, 1999-NMCA-152, ¶ 25, 128 N.M. 345, 992 P.2d 896)). "In writing and construing the criminal law, both our state legislature and this Court owe the people of this state a duty of clarity. We cannot ask our citizens . . . to guess at the meaning of a criminal statute." *State v. Sung*, 2000-NMCA-031, ¶ 15, 128 N.M. 786, 999 P.2d 430. To satisfy the constitutional requirements of due process, a criminal statute must, with sufficient certainty, alert a person of ordinary intelligence that his conduct is prohibited. *See State v. Andrews*, 1997-NMCA-017, ¶ 10, 123 N.M. 95, 934 P.2d 289; *see also Shawna C.*, 2005-NMCA-066, ¶ 32 ("In the criminal context, due process requires that a statute be drafted so that it provides fair warning of the conduct sought to be proscribed and so it does not encourage arbitrary or discriminatory enforcement."). As the Colorado Supreme Court observed when construing an endangerment statute identical to our own, "we seriously doubt whether 'may' in a criminal statute provides a fair description of the prohibited conduct, since virtually any conduct directed toward a child has the possibility, however slim, of endangering the child's life or health." *People v. Hoehl*, 568 P.2d 484, 486 (Colo. 1977) (*en banc*) (charging defendant with endangerment after allegedly holding child's hand to a radiator, resulting in serious second- and third-degree burns) (interpreting prior version of Colo. Rev. Stat. § 18-6-401(1)(A) (1973)).

**{19}** To avoid due process and vagueness problems, courts have interpreted *may* to require a greater degree of certainty to effectuate legislative intent. Black's Law Dictionary 1000 (8th ed. 2004); *Hoehl*, 568 P.2d at 486 (construing an identical endangerment statute's use of "may endanger" as requiring a "reasonable *probability* that the child's life or health will be endangered" (emphasis added)); *State v. Fisher*, 631 P.2d 239, 242 (Kan. 1981) (word "may" as used in Kansas child abuse statute given restrictive construction, indicating reasonable *probability* or likelihood the child would be placed in situation whereby that child's life or health will be endangered) (emphasis added)). *But see State v. Hubble*, 2009-NMSC-014, ¶ 13, 146 N.M. 70, 206 P.3d 579 (interpreting the term "may" to require only a possibility that other traffic would be affected for purposes of a misdemeanor turn signal

violation).

**{20}** However, we acknowledge there are many situations that may not produce a strict mathematical probability of harm, but nevertheless endanger a child. For example, if a defendant placed one bullet in a six-shot revolver, spun the chamber, placed the pistol to the child's head, and pulled the trigger, the risk that the child will suffer a lethal shot is only 16.67%, less than a statistical probability. Yet few would doubt the very real and unacceptable risk of harm to the child.

**{21}** Even more problematic are situations such as the present case, where the probability of harm cannot easily be measured or accurately quantified as a mathematical statistic. Therefore, a standard that requires proof of a strict probability under all circumstances poses too rigid a bar in its application. For these reasons, it is apparent that neither probability nor possibility provides an accurate, universal description of legislative intent.

**{22}** Accordingly, we look to the Uniform Jury Instruction on child endangerment for guidance on the endangerment standard. UJI 14-604 NMRA asks the jury to determine whether the "defendant caused [the child] to be placed in a situation which endangered the life or health of [the child]." The UJI does not define "endangerment." *See* Black's Law Dictionary 568 (8th ed. 2004) ("endangerment" is "[t]he act or an instance of putting someone or something in danger; exposure to peril or harm"). However, to find that the accused acted with the requisite mens rea, the jury is instructed that it must find that "defendant's conduct created a *substantial and foreseeable risk*" of harm. *See* UJI 14-604 (emphasis added). This standard more closely aligns with the legislative purpose that animates the child endangerment statute - to punish conduct that creates a truly significant risk of serious harm to children.

**{23}** Our prior cases illustrate that there are several factors the factfinder may consider to determine whether the risk created by an accused's conduct is substantial and foreseeable. One is the gravity of the threatened harm. *See State v. Trujillo*, 2002-NMCA-100, ¶ 21, 132 N.M. 649, 53 P.3d 909 (stating that a defendant's conduct must create a substantial risk with "potentially serious consequences to the life or health of a child"). It is the gravity of the risk that serves to place an individual on notice that his conduct is perilous, and potentially criminal, thereby satisfying due process concerns. *See State v. Schoonmaker*, 2008-NMSC-010, ¶ 43, 143 N.M. 373, 176 P.3d 1105 ("What distinguishes civil negligence from criminal negligence is not whether the person is subjectively aware of a risk of harm; rather, *it is the magnitude of the risk itself*." (Emphasis added.)).

**{24}** In many of our prior endangerment cases, the seriousness of the threatened injury has often been apparent. *See Graham*, 2005-NMSC-004, ¶ 10 (defendant left marijuana in areas accessible to children, including a potent marijuana bud in a baby crib); *McGruder*, 1997-NMSC-023, ¶¶ 5-6 (defendant fatally shot mother's boyfriend before threatening to shoot mother who was standing in front of her child in the line of fire); *Ungarten*, 115 N.M. 609-10, 856 P.2d 571-72 (defendant brandished knife at child's father while child was standing

7

directly behind father, and child testified that the knife came so close to his body that he "could not discern whether it was directed at him or his father"); *State v. Guilez*, 2000-NMSC-020, 129 N.M. 240, 4 P.3d 1231 (defendant failed to secure three-year-old child in a safety seat and drove his truck while intoxicated at night without working head lights or tail lights before crashing into a fence), *abrogated by State v. Santillanes*, 2001-NMSC-018, 130 N.M. 464, 27 P.3d 456; *State v. Castañeda*, 2001-NMCA-052, ¶ 14, 130 N.M. 679, 30 P.3d 368 (defendant drove while intoxicated on the wrong side of a divided highway with children in the vehicle that were unsecured by seatbelts).

**{25}** We have also relied on the Legislature's independent assessment that conduct is inherently perilous when evaluating endangerment convictions. *See Graham,* 2005-NMSC-004, ¶ 12 (noting that the Legislature's designation of marijuana as a Schedule I controlled substance, increased penalties for distributing marijuana to minors or in the vicinity of schools, all illustrate a legislative determination that marijuana is a dangerous substance, particularly for minors.). Where a defendant's underlying conduct violates a separate criminal statute, such legislative declaration of harm may be useful, though not dispositive, to an endangerment analysis when the Legislature has defined the act as a threat to public health, safety, and welfare.

**{26}** In addition, although no longer the determinative factor, the likelihood that harm will occur remains an important consideration when evaluating the magnitude of the risk. We have declined to uphold endangerment convictions where the risk of harm is too remote, which may indicate that the harm was not foreseeable. *See State v. Clemonts*, 2006-NMCA-031, ¶ 16, 139 N.M. 147, 130 P.3d 208 (reversing child endangerment conviction where defendant committed misdemeanor traffic offenses while engaged in low-speed police chase with children in car but defendant "did not expose a *substantial risk* to the children's lives or health as passengers in Defendant's car" (emphasis added)); *State v. Roybal*, 115 N.M. 27, 34, 846 P.2d 333, 340 (Ct. App. 1992) (reversing conviction for child endangerment where defendant left his six-year-old daughter in car near a drug transaction but removed from any actual threat of harm); *Jensen*, 2006-NMSC-045, ¶ 10 (holding the State must prove that "a defendant place[d] a child within the zone of danger and physically close to an inherently dangerous situation").

**Sufficiency and Nature of the Evidence**

**{27}** Having clarified the appropriate endangerment standard, we turn to the sufficiency of the evidence necessary to prove a criminal violation. We discuss first the evidence pertaining to the alleged endangerment of the two boys, Juan, age four, and Leo, age two. In this respect, the present case is novel in that we are asked to determine for the first time whether a filthy home environment is sufficient on its own to support a felony endangerment conviction. Our recent decision in *Jensen* indicates that conditions in a home may, in some extreme circumstances, create a sufficiently dangerous environment to rise to the level of criminal child endangerment. 2006-NMSC-045, ¶ 14. However, we stated in *Jensen* that the State has the burden to identify the specific dangers posed by the living environment and

8

to present evidence to demonstrate that such filthy conditions endangered the child. *Id.* ¶ 14. We affirm the principles behind that conclusion here and, consistent with how juries are instructed on the subject, the State must present evidence to prove a substantial and foreseeable risk that such filthy living conditions endangered the child.

**{28}** In *Jensen*, the defendant allowed his fifteen-year-old neighbor, Robbie, to become intoxicated at his house, smoke cigarettes, and look at adult pornographic websites on the defendant's computer every night for more than two weeks. 2006-NMSC-045, ¶ 6. When Robbie was reported missing, police went to the defendant's home and discovered unimaginable conditions within. *Id.* ¶¶ 4-5. Witnesses described the presence of several dogs and even an emu inside the home, which needed to be removed by animal control officers before the police could enter. *Id.* ¶ 4. An officer testified that, once inside, she observed dog feces and vomit, rotten food, and rodent droppings throughout the home. The officer stated that

> [i]n the living room area, there were dog feces, dog vomit on the floor, and rat and bird droppings in a cage. The entire kitchen area, including the stove, dishwasher, sink, and counter top, was dirty and littered with rodent droppings. The stove top burners, where Defendant cooked for Robbie, were also littered with rat droppings. The computer table that Robbie frequently used to surf the Internet was covered with trash and had rat or mouse droppings. Black rotten food was in the refrigerator next to some good hamburger meat. There was no place to sit at the dining room table without coming into contact with the extremely dirty conditions. The baseboards looked as though dogs had urinated on them, and the dirty bathroom had empty coke bottles and a filthy looking plastic soda pop jug with a yellowish orange liquid in it. The entire house was littered with dust, papers, bottles, and animal waste that created a constant stench. In fact, an animal control officer who came to take Defendant's emu had to go outside to avoid vomiting from the smell.

*Id.* ¶ 5.

**{29}** The State argued that these conditions endangered Robbie by exposing him to a risk of contracting hantavirus. *Id.* ¶ 14. Jensen responded that the conditions in his home only created a speculative possibility of danger, which was unsubstantiated by specific evidence sufficient to satisfy the criminal child endangerment standard. *Id.* ¶ 13. To that extent, we agreed with the defendant, holding that the State failed to present evidence to assist the jury with understanding how one contracts hantavirus and how one would connect that disease to the particular conditions in the defendant's home. *Id.* ¶ 14.

**{30}** However, the endangerment charge was not premised exclusively on filthy conditions, but rather on a combination of risks including the criminal acts of supplying alcohol to a minor, allowing him to drink in excess to the point of sickness every night for

9

two weeks, and allowing him to view pornography and smoke cigarettes, all within the filthy environment.  Given the cumulative effect of this evidence, we affirmed the child endangerment conviction, noting that these factors "[distinguish] this case from those cases where only filthy conditions are at issue." *Id.* ¶ 15.

**{31}**    *Jensen* supports the proposition that particularly egregious living conditions can conceivably fall within the ambit of criminal child endangerment.   The conditions in Defendant Chavez's home appear to be factually similar to those described in *Jensen*, although arguably not as extreme.  However, the present case is materially different from *Jensen*, in part based on the absence of any evidence indicating that Defendant engaged in other, per se unlawful acts to bolster the endangerment charges.  Therefore, as we stated in *Jensen*, "[w]hen filthy living conditions provide the *exclusive* basis for charging a defendant with child endangerment, the State must assist the trier of fact with evidence that supports a finding that there is a [substantial and foreseeable risk] that such filthy conditions endangered the child."  We now evaluate the present case in light of the standard we set forth above.

**Conviction for Endangering the Boys**

**{32}**    In order to prove child endangerment in this case, the State was required to show that the conditions created a substantial and foreseeable risk that Juan and Leo would suffer serious injuries from the otherwise lawful conditions in Defendant's home.  We begin our risk analysis by reviewing the gravity of the dangers created by the home environment to determine whether these dangers created a substantial and foreseeable risk of serious injury.

**{33}**    That this was a filthy house is obvious, evidenced by the dirty laundry, dirty dishes, dirty diapers, and mouse droppings throughout the home.  The home also contained certain dangerous features, such as the damaged ceiling, the broken glass in the yard, the nail-ridden debris from the collapsed shed, the gap in the floor boards on the front porch, and household chemicals within reach of the children.  Sheriff's Deputy Lisa Delorm testified that some of the dresser drawers were open and broken, and that the openings were easily accessible to the children who *could* get inside and get stuck.  She also noted that the closets were open and had piles of items stacked inside that *could* fall on and injure a child.  In the bathroom, witnesses observed that the shower and toilet were covered in mold.  A razor was accessible to the children. The most salient sanitary issue in the home was the presence of rodent droppings throughout, including in the cabinets where dishes and food were stored and on the dishes.

**{34}**    In addition, the home had no hot water available from the tap because the propane which fueled the water heater was empty and disconnected.  Clearly, a lack of hot water makes it difficult to sterilize dishes.  Although hot water was not available at the faucet, the record indicates that the stove was electric and presumptively capable of boiling water for washing, cooking, and even bathing.  Had the children's mother testified that the family was unable to heat water on the stove, or that the family functioned for months without any

10

ability to heat water, then in light of the other conditions, this aspect of the home would have presented a serious threat to the children's health.  The record, however, reveals no such testimony.

**{35}**     It is apparent that these conditions evidence poverty, filth, and neglect, and that they create some degree of risk, particularly for young children.  *Jensen*, 2006-NMSC-045, ¶ 3 ("[A] child's susceptibility to harm is a factor a jury might consider when determining whether a defendant has committed child abuse . . . .").  But the question before us is whether these conditions created a substantial and foreseeable threat of serious injury.  As we have said, not every risk of injury rises to the level of felony child endangerment.  The State was required to establish that the risks arising from this home environment were far greater than those in the average home.

**{36}**     The dangerous aspects identified by the State in Defendant's home included broken glass, nails, dirty diapers, household chemicals, trash, and mold.    Under certain circumstances supported by substantial evidence, similar conditions could conceivably present the kind of risk of serious injury that falls within the statute.  *Cf. State v. Deskins*, 731 P.2d 104, 105-06 (Ariz. Ct. App. 1986) ("[T]he jury heard evidence of unsanitary conditions, including a leaking portable toilet and that the children slept in close proximity to animals which appeared to be diseased and scrap metal automobile parts, tin cans and other discarded items.  The children, who were kept barefoot, were not protected from scrap lumber with protruding nails and were exposed to the animal feces . . . . *The jury heard evidence that the parents were given one week in which to make changes which were indicated by the caseworker, but failed or refused to do so*." (Emphasis added.)).  For example, the length of time that these conditions are allowed to exist and the amount of supervision in the home are certainly factors that can increase or mitigate the degree of risk involved.  Unfortunately, although the State offered some testimony on these factors, the record is largely silent in this regard.

**{37}**     The problem with the present case and this record is the lack of any specific evidence connecting these conditions to a substantial and foreseeable risk of harm.  Any dirty house can lead to illness or injury, but the critical difference that distinguishes a filthy house from conditions that are criminal is whether those conditions present a truly consequential and foreseeable threat of harm to children.  The risk of a cut or a bruise is not the same as the risk of a virulent disease.  Our endangerment jurisprudence, as illustrated by *Jensen*, indicates that most of the hazards present in Defendant's home do not present the sort of serious risk anticipated by our Legislature, at least in the absence of specific evidence to the contrary.

**{38}**     Of course, the risk of disease and parasites presents a potentially more serious threat of harm.  The State presented several witnesses to testify about the extent of the rodent infestation and the prevalence of rodent droppings throughout the home.  Although mice are commonly associated with disease, not every exposure to rodents will result in serious illness.  Therefore, the presence of mice in a home is not enough on its own to conclude that the children are at risk of contracting a serious illness.

11

**{39}** Similar to *Jensen*, the State failed to present any specific evidence to establish a substantial and foreseeable risk that the children would suffer serious disease as a result of being present in Defendant's home. The State offered no expert testimony. Instead, the State merely cross-examined Defendant's own expert, Dr. Sparing, by asking, "Would you agree that having an infestation of mice in a home is not conducive to good health?" Dr. Sparing responded by acknowledging that mice can carry different diseases and parasites, including hantavirus and plague. But Dr. Sparing was never asked to address the specific risk that the children would contract a serious illness from this particular environment.

**{40}** The State could have met its burden in this case. The risk of serious disease or illness is a matter of science and can be established with empirical and scientific evidence. To determine the presence of disease or parasites, the State could have subjected the rodent droppings to laboratory testing. *See State v. Greene*, 811 P.2d 356, 358-59 (Ariz. Ct. App. 1991) (stating that "neither the feces nor the spoiled food had been tested for the presence of disease or parasites"). The State could have presented testimony from a health professional explaining the scientific nexus and degree of likelihood regarding these conditions and specific diseases or other significant threats to the welfare of children. The entire house could have been environmentally analyzed for the presence of unusual health risks. The State could have presented statistical information from the Department of Health or the Centers for Disease Control on the presence and incidence of hantavirus and plague in or near Tularosa. As we indicated in *Jensen*, our juries deserve more evidentiary assistance, particularly when the risks are based on matters of science, to help them decide whether the threat of serious illness is significantly greater in the particular home in question.

**{41}** Importantly, the State had been aware of this family even before the investigation into Shelby's death; Defendant had two prior encounters with the New Mexico Children, Youth and Families Department (CYFD). The first encounter occurred in 2001 when a social worker visited the family's prior home in Carrizozo. Although the social worker never went inside the home, she reported that a visual inspection revealed "unsanitary" conditions and "safety issues." It is unclear from the record whether Defendant and his family actually resided in the home at that time, and the record does not indicate that further actions were taken by CYFD after that visit. The second visit occurred only one month before Shelby died, when police officers responded to a CYFD call from Defendant's cousin and went to the home to perform a welfare check on Shelby. The police left without taking any action, and the record does not reflect any further actions by CYFD between the September 7, 2003 visit and Shelby's death on October 2, 2003.

**{42}** The Court of Appeals concluded that these visits placed Defendant on notice that the conditions in his home were perilous. *Chavez*, 2008-NMCA-126, ¶ 10. We agree that the CYFD visits provide an inference that Defendant should have known, at the very least, that he needed to pay attention to conditions in his home. However, the lack of any CYFD action following the two prior visits suggests that those conditions, while unclean, were not seriously threatening and did not necessitate additional, immediate intervention through the

12

civil process. Without a record of further intervention, it is difficult for this Court to envision how conditions that did not merit further *civil* action could put Defendant on notice of the potential for *criminal* prosecution.

{43} We do not imply that the State need exhaust all of its civil remedies before turning to criminal sanction. However, use of the civil process seems particularly appropriate here. This is not a case where the children were subjected to physical violence, nor where the parents struggled with addiction and the children suffered as a result — a predicament all too common in child neglect cases. Instead, this is a case where the family struggled with poverty, and our ultimate goal should be to assist, rather than to punish, that status. Had the State intervened in a more meaningful way, the family would have either addressed the home environment or the State could have removed the children to protect their health and safety. Failing to intervene civilly, however, the State then put on a criminal case without the kind of specific and pointed evidence necessary to support the verdict. Evidence of diffuse hazards and a general lack of supervision is insufficient to establish that the children faced specific and identifiable harm in violation of the endangerment statute. Without additional evidence, the risk of harm was only speculative, indicating that Defendant's conviction was based on the condition of his home rather than the specific dangers arising therefrom.

**Conviction Relating to Endangerment—Not Death—of the Infant Shelby**

{44} Defendant was also charged with child abuse resulting in death and a step-down charge of child abuse by endangerment based on the risk created by allowing his infant daughter Shelby to sleep in a drawer. The autopsy listed the cause of death as "inconclusive," and the medical examiner testified that he could not tell with any certainty whether the death occurred as a result of Sudden Infant Death Syndrome or because of asphyxiation. The jury ultimately acquitted Defendant on the charge of child abuse resulting in death, and, therefore, we do not consider whether the drawer bed caused any injury in fact. The question before us is limited to whether the evidence established that, by allowing Shelby to be placed in the drawer to sleep, Defendant created a substantial and foreseeable risk that Shelby would suffer a serious injury. In addition, the drawer is the only significant factor that distinguishes the conviction relating to Shelby from Defendant's conviction for endangering his sons. Therefore, to the extent that the unsanitary conditions in the home presented dangers common to all three children, they would merge into a single conviction for purposes of double jeopardy, and we do not consider them again in this section.

{45} The State pursued this case under a criminal negligence theory and, therefore, was required to prove beyond a reasonable doubt that Defendant "knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." *Id.* § 30-6-1(A)(3). As we recently stated in *Schoonmaker*, criminal negligence for purposes of child endangerment is measured objectively, and occurs when a person

> *should* be aware of a substantial and unjustifiable risk [that harm] will result
> from his conduct. The risk must be of such a nature and degree that the

13

actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care . . . .

2008-NMSC-010, ¶ 43 (quoting Model Penal Code § 2.02(c) (Official Draft and Revised Comments 1962)) (emphasis omitted). Thus, the State had the burden to first establish the actus reus of endangerment—that the drawer created a substantial and foreseeable risk of harm. Once the danger is established, the State must also show that a reasonable person would have apprehended the risk, and that Defendant recklessly disregarded the risk by allowing Shelby to sleep in the drawer.

{46}    The State sought to show that the sleeping arrangement created a serious danger to Shelby due to Shelby's size in relation to the drawer and bedding. At five months old, Shelby was approximately twenty-six inches long. The drawer that Defendant chose for his daughter measured 29-by-15 inches. Several witnesses testified that the drawer, particularly when filled with soft bedding and a blanket, did not allow Shelby much room to move around. The State presented testimony that if the bedding blocked Shelby's nose and mouth, she may not have had room to free herself, creating a possibility that she could suffocate. In addition, witnesses testified that if Shelby became pressed up against the wall of the drawer, she might re-breathe her expelled air, high in carbon dioxide, creating a risk of asphyxiation. This is the sort of substantial injury contemplated by our endangerment statute.

{47}    However, in addition to the gravity of the potential injury, we must also consider whether it was foreseeable that an injury would actually occur. In performing this review, we note the absence of evidence in the record to indicate that the sleeping conditions presented anything more than a mere possibility of harm.[1]

{48}    The State asked Doctor Ross Reichard, the medical examiner who performed the autopsy on Shelby, whether the sleeping environment was dangerous. Dr. Reichard responded that danger was possible, but that he listed cause of death as "undetermined" because he could not prove one way or the other that the sleeping environment was a cause of Shelby's death. The State also asked Dr. Reichard whether "placing an infant such as Shelby with her size on her stomach in a fifteen by twenty-nine inch drawer, with soft items in it [makes] it more likely or less likely that she may suffocate," to which he responded only that it was "worrisome" and that suffocation was a "possibility." Both of these statements were in relation to the likelihood that the sleeping environment actually caused Shelby's death, rather than whether harm would foreseeably result from placing Shelby to

---

[1]The testimony cited in the dissent confirms only a *possibility* that harm would occur. As we have already discussed, the term "possibility" is unhelpful as a measure of proof in this context. A remote possibility of harm is insufficient to support a felony conviction, and an endangerment conviction cannot be sustained without proof of a greater degree of risk.

14

sleep in the drawer.

**{49}** The only evidence presented to quantify the likelihood that harm would occur came from Defendant's own expert witness, Dr. Sparing, who testified that he had never seen a child suffocate in a drawer, and that even if possible, it would be uncommon. He also stated that the risk created by placing a child to sleep in a drawer is very small, unpredictable and unmeasurable, particularly in comparison to conduct that carries a great deal of risk, such as failing to secure a child in a car seat. Dr. Sparing estimated that the risk of harm created by placing a child to sleep on a water bed, for example, is more "definite and predictable" and is much greater than placing a child to sleep in a drawer. He further stated, "We know now that putting children on soft water beds, infants on soft water beds face down, could potentially kill them. Does it kill all of them? No. A very, very tiny number. Maybe one out of a thousand. One out of two or three thousand, something like that." Dr. Sparing's testimony provided the only substantive evidence to quantify the probability that harm would occur, and he opined that "a reasonable individual would not look at an environment like this and consider the child to be at risk."

**{50}** The elevated risk, if any, created by the small size of the drawer in relation to Shelby's body, and by including soft bedding in the drawer which restricted the infant's ability to move, is not quantifiable based solely on common knowledge or experience. Specific evidence was needed to assist the jury in ensuring that a conviction would be based on science and not emotion. This is particularly important in this case, where the trial focused on the death of an infant and the level of parenting was easy to criticize. Natural factors of sympathy and even outrage in the face of an infant death can create a perilous situation where judgment is based on emotion and not evidence.

**{51}** To meet its burden, the State could have presented testimony from a medical doctor or a health professional to explain and quantify the increase in risk from these factors, individually or in combination. The State could have referred to medical journals or treatises on the risks and causes of infant suffocation or statistical information on the risk of death from certain infant sleeping arrangements. Clearly, some things can be left to ordinary jury knowledge and experience, while others cannot. The fatal flaw here is that the prosecution left its *entire* case to the jury unaided by the kind of evidence necessary to prove its case.

**{52}** Defendant's act of placing a child to sleep in a drawer as a temporary solution to a broken bassinet is not the kind of obvious risk contemplated by our Legislature as a felony. It is difficult to conceive that identical conditions would be prosecuted as felony child endangerment in the absence of the infant's death. Without additional evidence to establish significantly greater level of risk of injury or death under these circumstances, the jury's conviction is supported primarily by speculation and surmise.

**CONCLUSION**

**{53}** For the reasons stated in this Opinion, we reverse all convictions.

15

{54}    **IT IS SO ORDERED**.

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**CHARLES W. DANIELS, Justice**

**PETRA JIMENEZ MAES, Justice (concurring in part and dissenting in part)**

**MAES, Justice (concurring in part and dissenting in part).**

{55}    I concur in the majority opinion that the evidence in the present case is insufficient to establish that the filthy living conditions in Defendant's home posed a substantial and foreseeable risk of harm to his three children.  I disagree, however, that the evidence was insufficient to permit the jury reasonably to find that Defendant recklessly endangered the life or health of five-month old Shelby by placing her to sleep face-down in a small confined space filled with soft bedding.  Accordingly, I respectfully dissent from that portion of the majority opinion.

{56}    The deferential standard by which this Court reviews sufficiency of the evidence claims is well established.

> [T]he reviewing court engages in a two-step process:  First it reviews the evidence [resolving all conflicts and indulging all permissible inferences] with deference to the findings of the [trier of fact]; then it determines whether the evidence, viewed in this manner, could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt.

*State v. Myers*, 2009-NMSC-016, ¶ 13, __ N.M. __, __ P.3d __ (second alteration in original) (citation omitted).  "Our role is not to weigh the evidence, nor do we substitute [our] judgment for that of the fact finder so long as there is sufficient evidence to support the verdict."  *State v. Day*, 2008-NMSC-007, ¶ 15, 143 N.M. 359, 176 P.3d 1091 (internal quotation marks and citation omitted).

16

**{57}** To find Defendant guilty of negligent child abuse contrary to NMSA 1978, Section 30-6-1(D)(1) (2005), the jury was required to find the following essential elements beyond a reasonable doubt: (1) Defendant caused the child to be placed in a situation that endangered the child's life or health; (2) Defendant knew or should have known that Defendant's conduct created a substantial and foreseeable risk, Defendant disregarded that risk, and Defendant was wholly indifferent to the consequences of the conduct and to the welfare and safety of the child; (3) the child was under the age of eighteen; and (4) this happened in New Mexico on or between September 7, 2003 through October 2, 2003. *See* UJI 14-604 NMRA. The question is not whether this Court is convinced of Defendant's guilt beyond a reasonable doubt, but rather, "whether, viewing all of the evidence in a light most favorable to upholding the jury's verdict, there is substantial evidence in the record to support *any* rational trier of fact being so convinced." *State v. Graham*, 2005-NMSC-004, ¶ 7, 137 N.M. 197, 109 P.3d 285.

**{58}** The evidence established that Shelby's bassinette had broken approximately a day or two before her death. Defendant planned to retrieve a crib from his mother, who lived in Carrizozo, but in the meantime, he fashioned a make-shift bassinette out of a dresser drawer. Shelby, at five months old, was approximately twenty-six inches in length, and the drawer was only marginally bigger, measuring 29-by-15 inches. Defendant padded the drawer with a sheet, a blanket, and a pillow.

**{59}** On the night of October 1, 2003, Jennifer Wheeler was home alone with Leo, Juan and Shelby, while Defendant went to Alamogordo and Carrizozo. Wheeler and the children fell asleep watching television in the living room. At some point Wheeler woke up, changed Shelby's diaper, and placed her to sleep in the drawer. Sometime between 3:00 a.m. and 5:00 a.m. the next morning, Defendant arrived home. Shelby woke up, and although Wheeler tried to give her a bottle, she refused to eat. Wheeler and Defendant put Shelby back to sleep in the drawer on her stomach because "she liked to go to sleep on her stomach." Defendant typically would "neatly tuck[]" the blankets around and underneath Shelby, sometimes covering her head, to ensure that the blankets remained in place throughout the night.

**{60}** A few hours later, Wheeler was shaken awake by Defendant. Defendant was holding Shelby, who was covered from head-to-toe in a blanket, and said, "Shelby's not breathing. She's not breathing." Subsequent resuscitation efforts were unsuccessful and Shelby was pronounced dead later that morning.

**{61}** The Office of the Medical Investigator launched an investigation into the cause and manner of Shelby's death. Cheryl Bunker, a field deputy medical investigator for Otero County, interviewed Wheeler and Defendant in connection with the investigation. Both Wheeler and Defendant initially informed Bunker that they had placed Shelby to sleep in a bassinette. When Bunker inspected the home, however, she could not find a bassinette, but she did find the drawer filled with soft bedding. Bunker testified that she became concerned about the drawer because "[t]he sleeping conditions—the baby was placed in a drawer on

17

blankets that were placed inside the drawer. The drawer was—in my opinion—not wide enough or long enough for an infant to move around freely." Wheeler and Defendant subsequently admitted that Shelby had been sleeping in the drawer on the night that she died.

**{62}** Pamela Wong, a social worker supervisor with the investigations unit for the Children, Youth and Families Department (Department), also testified about Shelby's sleeping environment. She explained that the Department

> understands poverty. We understand the difference between poverty and neglect. There are normally sleeping spaces for children, whether it's a bed or a crib or a bassinette. Generally, those items are in homes for children to sleep on. Pallets on the floor, perhaps. Normally, you don't see an infant sleeping in a drawer.

Wong testified that based on her training and experience, the drawer in which Shelby had been placed to sleep was inappropriate for a child of Shelby's age and size because "there was [not] adequate room in that particular drawer for a five-month-old child."

**{63}** At trial, the State admitted into evidence a videotape depicting the drawer in the condition in which it was found by the police on the day that Shelby died. From this videotape, it appears that the drawer was filled to overflowing with soft bedding. Indeed, large blankets or sheets can be seen spilling out of the drawer onto the floor. Additionally, it reasonably could be inferred that the bottom of the drawer was lined with a pillow, which may have been intended to serve as a make-shift mattress. The videotape, as well as the drawer and the blankets, was admitted into evidence and, therefore, was available to the jury for visual inspection during their deliberations.

**{64}** Doctor Ross Reichard, a forensic pathologist with the Office of the Medical Investigator, was unable to determine the cause and manner of Shelby's death based on his post-mortem examination of her physical condition. Dr. Reichard testified that although there was no external evidence of physical trauma, he could not exclude the possibility that Shelby had suffocated to death because

> based on our investigation, the decedent had been sleeping in a small drawer with a fixed wall, just like a regular dresser drawer, with a pad and a blanket. And, so, one of our concerns in small children is their inability to move and free themselves if they're to get into a situation where their airway may be obstructed. So, a soft material may [occlude] their airway. Their face may be between, say, the solid drawer, there may be a blanket or a pillow over which [there was]—based on our investigation, those were likely present. And, that may have resulted in the child re-breathing the same air, which can then lead to their death. Unfortunately, there are limits to modern medicine and pathology as well, and one of those is that there's certain things that we can't determine, based on the autopsy. So, for example, if the airway is

18

occluded or the—there's some sort of obstruction to the breathing, we would not necessarily find any evidence of that on the autopsy. And, so, based on our investigation, we felt that those things were worrisome enough for us that the death was best classified as an undetermined cause, and, therefore, undetermined manner of death.

Dr. Reichard further explained that "[d]epending on the circumstances it can be relatively easy for a child to suffocate at that age," and that the magnitude of the risk depends on "the size and the surrounding environment and the placement of the infant." Based on Shelby's size, the size of the drawer, and the amount of soft bedding inside the drawer, Dr. Reichard testified that, in his opinion, there was a reasonable possibility that Shelby's sleeping environment posed a risk of danger to her life or health.

{65}    Aside from suffocation, the other possible cause of Shelby's death was Sudden Infant Death Syndrome (SIDS). Dr. Reichard explained that SIDS

is a category of deaths that occur in children that are typically older than one month of age, and less than six months, and most of them occur between the ages of one month and four months of age. And, what this is, is a classification that after—of the death—that after a complete autopsy, including a scene investigation, you find no explanation for their deaths. So, it's a way of categorizing a group of deaths that occur in children, in a relatively specific time frame. And, it's felt to be a natural death, although no exact explanation for why their death is currently known.

Dr. Reichard testified that to reduce the occurrence of SIDS, the Back to Sleep campaign encourages parents to put their children to sleep on their backs, and that since this campaign first started in the early 1990s there has been a decrease in the number of SIDS-related deaths. Shelby's death, however, could not be classified as a SIDS-related death because of the reasonable possibility that she had died from suffocation.

{66}    Defendant offered the expert testimony of Doctor Chrisley Sparing, a forensic pathologist and Chief Medical Examiner for the state of Georgia. Dr. Sparing agreed with Dr. Reichard that the cause and manner of Shelby's death could not be determined based on the results of the autopsy because "[w]e know as pathologists that little babies could be suffocated, and leave no mark on them whatsoever," and in the present case, there was no "physical evidence from the autopsy to prove or disprove that something like a pillow or a blanket or excess bedding caused the child's death, or that this is just crib death [SIDS]." Additionally, Dr. Sparing agreed with Dr. Reichard that "infants can be suffocated, you know, rapidly, within just a few minutes," and that based on Shelby's age and size, the size of the drawer, and the amount of soft bedding inside of the drawer, there was a reasonable possibility that her sleeping environment posed a danger to her life or health. Specifically,

[i]f the child became entrapped, especially between the bedding—

19

maybe turned and was up and fell or became lodged in between the bedding and the edge of the inner lining of the drawer, it's possible that this could interfere with the child's ability to breathe and the child could possibly suffocate. I have to say in my career, I've never seen a child that suffocated in a drawer before. I can't tell you it's impossible, but it's—I mean, all I can say is this possibility exists, although I would say it would be relatively uncommon. Could it happen? Sure. But, that's the best that I can really say.

**{67}** Construing the foregoing evidence in the light most favorable to the jury's verdict, I believe that it was sufficient to support the jury's factual finding that Defendant's conduct posed a substantial and foreseeable risk to Shelby's life or health. Bunker, Wong, Dr. Reichard and Dr. Sparing all testified that the drawer was an inappropriate sleeping environment for an infant of Shelby's age and size. Indeed, both Dr. Reichard and Dr. Sparing agreed that it is very easy for a five-month-old infant to suffocate and that suffocation can occur in a matter of mere minutes. Additionally, they both agreed that in light of Shelby's age and size, the size of the drawer, the excessive amount of soft bedding, and Shelby's prone sleeping position, Shelby's sleeping environment posed a risk of danger of suffocation. Accordingly, the evidence was sufficient for the jury reasonably to find that Defendant's conduct placed Shelby in a situation "that may endanger [her] life or health" contrary to Section 30-6-1(D)(1).

**{68}** The majority concludes, however, that the evidence was insufficient to prove that the risk of danger to Shelby's life or health was substantial and foreseeable. I respectfully disagree. As the majority acknowledges, the risk of death by suffocation is a "substantial injury" of the type "contemplated by our endangerment statute." Given the severity of the harm and the ease with which infants may suffocate, parents are on notice that they must be vigilant in their care and supervision of infants. Indeed, it is common knowledge that many everyday household items that pose no risk of harm to adults, i.e., plastic bags and items small enough to fit within a child's mouth, pose a unique and significant risk of harm to infants, namely, the risk of death by suffocation. Furthermore, consistent with the expert testimony in the present case, it is common knowledge that infants are particularly vulnerable to the risk of suffocation while sleeping and that this risk is heightened when any of the following factors are present: (1) a soft sleeping surface, (2) a prone sleeping position, (3) a confined space with fixed walls in which the infant is unable to move about freely, and (4) soft items that may block the infant's nose and mouth. In the present case, *all* of these risk factors were present and, therefore, the jury reasonably could have found that they heightened the risk of suffocation to an unreasonable and intolerable degree. In light of the severity of the harm and the ease and speed with which the harm may occur, it defies logic and experience to characterize this risk as anything less than substantial and foreseeable.

**{69}** The majority opinion concludes, however, that no rational juror could have found that the risk of harm to Shelby was anything more than a remote possibility in light of Dr. Sparing's testimony. I disagree. First, I note that the jury was not required to credit Dr. Sparing's expert testimony, even if uncontradicted. *See State v. Jason F.*, 1998-NMSC-010,

¶ 29, 125 N.M. 111, 957 P.2d 1145; *see also State v. Moore*, 42 N.M. 135, 160, 76 P.2d 19, 34 (1938) ("The judgments of experts or the inferences of skilled witnesses, even when unanimous and uncontroverted, are not necessarily conclusive on the jury, but may be disregarded by it."). Second, as the following discussion demonstrates, the majority fails to construe Dr. Sparing's testimony in the light most favorable to the jury's verdict.

**{70}** The record reflects the following colloquy between Dr. Sparing and defense counsel with respect to the possibility that Shelby had suffocated on soft bedding:

> [Defense Counsel]: And, if it did happen, how would you characterize that, as to cause and manner of death?
>
> [Dr. Sparing]: That would be an accident. I would call it suffocation, and how it occurred is suffocated in bed clothes within drawer. That would be considered to be an accidental death.
>
> . . . .
>
> [Defense Counsel]: Why not homicide if someone puts blankets in there?
>
> [Dr. Sparing]: Because—
>
> [Defense Counsel]: (Inaudible) expertise?
>
> . . . .
>
> [Dr. Sparing]: Because, basically, for an accident, we consider that—the terminology we use is "unpredictable," "unforeseen," and "unknown." Basically, a reasonable individual would not look at an environment like this and consider the child to be at risk. It's a drawer with blankets and bedding in it to sleep in. . . . But, things can happen, and result in the child being dead. And, it's not predictable. It's not to say that, you know, you should never, ever, ever do this. But, the risk, albeit small, exists. And, because it's unpredictable and unforeseen, then we consider those to be accidents. No one intended for such a death to occur. But, accidents happen in all sorts of different ways.

On redirect examination, defense counsel clarified Dr. Sparing's testimony with respect to the manner of death if an infant suffocates on soft bedding.

> [Defense Counsel]: And, you talked about the fact that people are told not to put their infants on soft bedding. If parents do that, is that a homicide?
>
> [Dr. Sparing]: I've never seen—seen that rule[d], a homicide, or had a case like that come to my office or under my supervision.

[Defense Counsel]:      Well, why isn't it—if parents should know better?

[Dr. Sparing]:          There's a difference between a risk that is very, very small and hypothetical, and all those unmeasurable, versus that we know carries a great deal of risk. I mentioned car seats earlier. We know that if you put an infant in a car seat and strap it in, strap that car seat in, and there's a head-on collision, more likely than not, that infant is going to survive and be okay. If it's not in a car seat, if it's sitting in mama's lap, or the car seat isn't strapped in, and there's a head-on collision, the injuries are catastrophic, even fatal, more often than not. That is something we know, very, very, very clearly. That's why car seats are very, very important. But, bedding, when it comes down to it, there are certain situations where, I think, like, say on a water bed. We know now that putting children on soft water beds, infants on soft water beds face down, could potentially kill them. Does it kill all of them? No. A very, very, tiny number. Maybe one out of a thousand. One out of two or three thousand, something like that. But, it's something that potentially can happen. That doesn't mean that you should never, ever, ever, say, put a child on soft bedding because that's where you want a child, in soft bedding. But, there's a tiny risk that exists that most of the time is pretty much unpredictable. And, because it's speaking of a tiny risk that's unpredictable, versus a large risk like a car seat issue that is very, very predictable, that's why recommendations are very difficult to make, as far as where you put your baby to sleep. Do you put them on a naked mattress? No, you don't want to do that. You want the child comfortable so it will sleep, but covered up and taken care of. And, the vast majority—you know—ninety-nine point nine nine . . . percent, grow up and do just fine.

**{71}**     As the foregoing summary reflects, Dr. Sparing testified that if an infant suffocates to death on soft bedding, he would categorize the manner of death as an accident, rather than a homicide, *even if the parents should have known better*, because an accident is "unpredictable," "unforeseen," and "unknown." In the present case, it is undisputed that Shelby's death, if attributable to her sleeping conditions, was nothing short of a tragic accident. Nonetheless, accidental harm is not excluded from the purview of Section 30-6-1(D)(1), which explicitly provides that "[a]buse of a child consists of a person . . .

22

*negligently*, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health." (Emphasis added.)

**{72}**    This is not to say, however, that mere negligence is sufficient to sustain a conviction of negligent child abuse.  As this Court previously has observed, "the child abuse statute contains no indication that the legislature intended felony punishment to attach to ordinary negligent conduct" under Section 30-6-1(D).  *Santillanes v. State*, 115 N.M. 215, 223, 849 P.2d 358, 366 (1993).  Indeed, if "'imprudent and possibly negligent' conduct were sufficient to expose a care giver to criminal liability for child endangerment, 'undoubtedly the majority of parents in this county would be guilty of child endangering—at least for acts of similar culpability.'" *State v. Massengill*, 2003-NMCA-024, ¶ 46, 133 N.M. 263, 62 P.3d 354 (quoting *State v. Massey*, 715 N.E.2d 235, 238-39 (Ohio Ct. App. 1998)).  Accordingly, the State is required to prove that the defendant acted with criminally negligent intent, that is, that "the defendant knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child."  *Santillanes*, 115 N.M. at 222, 849 P.2d at 365.

**{73}**    In the present case, the evidence was sufficient to prove that Defendant's conduct was criminally negligent.  The jury reasonably could have inferred that Defendant acted with reckless disregard with respect to the risk of harm to Shelby by choosing a drawer that was too small for Shelby's size, placing a soft pillow on the bottom of the drawer, placing Shelby to sleep face-down on her stomach, and covering her head-to-toe with an excessive amount of soft bedding.  Defendant could have used a larger drawer or a laundry basket as a make-shift bassinette or alternatively, he could have procured a crib from his mother in Carizzozo.  Indeed, the evidence established that Defendant was in Carizzozo on the night that Shelby died, but that he did not bother to stop by his mother's house to pick up a crib for his infant daughter.  Additionally, Defendant could have placed Shelby to sleep on her back, used less soft bedding, or arranged the bedding more loosely, all of which would have reduced the risk of harm to Shelby's life or health.  Defendant, however,  did not do any of these things.

**{74}**    Although the State was not required to prove that Defendant actually was aware of the risk of harm, evidence existed from which the jury reasonably could have inferred consciousness of guilt.  It is well established that lying to the police about the circumstances surrounding a crime or an accident evidences "a consciousness of guilt that would allow the [trier of fact] to find a level of awareness on Defendant's part that his actions were likely to cause harm."  *State v. Worrick*, 2006-NMCA-035, ¶ 9, 139 N.M. 247, 131 P.3d 97; *see also State v. Faubion*, 1998 -NMCA- 095, ¶ 13, 125 N.M. 670, 964 P.2d 834 (holding that the defendant's "lies and misleading actions" are evidence of consciousness of guilt). Defendant initially lied to Bunker, informing her that Shelby had been sleeping in a bassinette on the night that she died.  The jury reasonably could have inferred that Defendant lied about Shelby's sleeping environment because he was aware that this environment posed a substantial and foreseeable risk of harm to Shelby's life or health.

**{75}**    For the foregoing reasons, I believe that the evidence was sufficient to support

23

Defendant's conviction of negligent child abuse contrary to Section 30-6-1(D)(1) with respect to Shelby. I therefore respectfully dissent.

_____
**PETRA JIMENEZ MAES, Justice**

**Topic Index for** *State v. Julio Chavez,* **No. 31,202**

**AE**           **Appeal and Error**

AE-SB           Substantial or Sufficient Evidence

**CT**           **Constitutional Law**

CT-DP           Due Process

**CL**           **Criminal Law**

CL-CN           Child Abuse and Neglect
CL-FE           Felony

**CA**           **Criminal Procedure**

CA-JI           Jury Instructions
CA-SE           Substantial or Sufficient Evidence