**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2013-NMCA-082

Filing Date: June 12, 2013

Docket No. 31,779

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

STEPHEN SCHAAF,

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Gary K. King, Attorney General
James W. Grayson, Assistant Attorney General
Santa Fe, NM

for Appellee

Jeff C. Lahann
Las Cruces, NM

for Appellant

## OPINION

**FRY, Judge.**

**{1}** Defendant appeals from the district court's judgment and sentence, entered pursuant to a bench trial, convicting him of one count of negligent child abuse by endangerment not resulting in death or great bodily harm and one count of possession of drug paraphernalia. On appeal, Defendant argues that the State failed to present evidence of the type of substantial and foreseeable risk of harm necessary to support his conviction for negligent child abuse by endangerment. We are persuaded that sufficient evidence supports Defendant's conviction. We therefore affirm.

1

## BACKGROUND

**{2}** The State presented the following evidence. Upon information from an anonymous tip that illegal drug use was occurring at the residence, the probation officer assigned to Defendant's wife (Ms. Schaaf) went to Defendant's and Ms. Schaaf's home for a field visit. The probation officer, Ms. Lee, believed that firearms might be present in the home due to Defendant's job as a security guard, despite Defendant's agreement to secure his firearms in a location outside of the residence. As a result, Ms. Lee asked for law enforcement assistance and was accompanied to Defendant's home by a uniformed officer, a detective, and another probation officer. They arrived at Defendant's home at around 2:30 in the afternoon on a school day, soon before the children were getting out of school. At the time, there were four children living in the home with Defendant and Ms. Schaaf: a fifteen-year-old boy, who was Defendant's stepson and Ms. Schaaf's biological son, and five-year-old triplets from Defendant's and Ms. Schaaf's marriage.

**{3}** Upon their arrival, the officers noticed that two cars were parked outside, a front window was open, and the television was on. They knocked on the doors several times, announced their presence, identified themselves, and yelled through the open window. It took Ms. Schaaf around five minutes to answer their calls and come to the door, a delay that was of concern to the officers. Ms. Schaaf came to the door wearing only pants and a bra, and she appeared dirty, with greasy hair, dark circles under her eyes, pale skin, and chapped lips. She claimed to have just gotten out of the shower. Soon after, Defendant came out from the master bedroom, looking similarly dirty and disheveled, and a glass pipe fell from his shorts onto the floor. The officers then conducted a search of Defendant's body and found two more glass /pipes in his waistband. The officers identified them as pipes used for smoking methamphetamine. Defendant admitted that he and Ms. Schaaf had been using methamphetamine for three days and had not slept.

**{4}** When the police and probation officers entered the home, they smelled smoke and an overwhelmingly strong chemical odor that made it hard to breathe and made one probation officer's eyes water. They found a filthy house with three cats running around, cat urine and feces everywhere, and the entire house was littered with trash, rotten food, dirty dishes, and piles of dirty clothes. In the living room on a table by the front door, the officers found a plastic baggie containing thirteen pills, which Defendant stated were antibiotics obtained from Mexico. The children's rooms and bathroom were in the same condition as the rest of the house: the beds had been urinated on; there was not adequate bedding; and there were toys, dirty clothes, rotten food, dried food embedded in the carpet, and cat feces all over.

**{5}** Defendant was asked where his firearm was located, and he responded that there were four in the master bedroom. The officers entered the master bedroom and found an open gun box on the floor containing two loaded firearms, plus spare ammunition and magazines. There were dirty dishes on the bed, many open and used needle syringes on the bed, food, trash, cat feces, lighters, and dirty clothes all over the floor, and pornographic

DVDs strewn about the room. Ms. Lee testified that one could hardly walk in the bedroom. Defendant told the officers that there were two more firearms in the master bedroom in a lockbox on the other side of the bed. There were toy gun replicas in the master bedroom and at least one in the triplets' room. The triplets played with the toy guns with and without permission or supervision. At least one of the toy guns was a Glock replica indistinguishable from real guns in the house in its appearance, weight, and feel.

{6}     The master bedroom also had a sliding glass door out to the backyard, which was the only entrance to the backyard from the residence. The backyard was an enclosed space with children's toys, lighters, a small propane torch, and undescribed drug paraphernalia.

{7}     In a police interview, Defendant admitted to smoking methamphetamine while the children were at home, both in the master bedroom and in common areas, including the living room and backyard. The residence had three bedrooms and two bathrooms and was estimated to be about 1,400 square feet. One of the officers testified that second-hand methamphetamine smoke is heavier than cigarette smoke, travels without dissipating, and leaves a residue that sticks to things and can be touched and absorbed into the body. The eldest son, a teenager, testified that one or two days before the police arrived at their house, Ms. Schaaf showed him a glass pipe that was underneath the blankets of the master bed and that he walked away, not knowing what to do. In the police interview, Defendant admitted that smoking methamphetamine in the residence created a risk that the children could have absorbed methamphetamine and could have tested positive for it. He also admitted that the condition of his house was not safe or sanitary for the children and that they could have been killed or injured.

**DISCUSSION**

**Substantial and Foreseeable Risk of Harm**

{8}     To provide context for Defendant's arguments, we first review our jurisprudence construing the child endangerment statute at issue. The Legislature has defined child abuse, in pertinent part, as "knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be[] . . . placed in a situation that may endanger the child's life or health." NMSA 1978, § 30-6-1(D)(1) (2009). Our Supreme Court has observed that "[t]aken literally, our endangerment statute could be read broadly to permit prosecution for any conduct, however remote the risk, that *may* endanger [a] child's life or health." *State v. Chavez*, 2009-NMSC-035, ¶ 16, 146 N.M. 434, 211 P.3d 891 (alterations in original) (internal quotation marks and citation omitted). However, the Court has further acknowledged that by making child endangerment a third degree felony, the "Legislature anticipated that criminal prosecution would be reserved for the most serious occurrences, and not for minor or theoretical dangers." *Id.* Mindful of these concerns, our courts strive to identify the magnitude and likelihood of the risk of harm to a child that is required for criminal prosecution under the endangerment statute. *See id.* ¶¶ 17-26. Adopting language from the uniform jury instruction for endangerment, our Supreme Court has declared that

3

the defendant's conduct must create " 'a *substantial and foreseeable risk*' of harm." *Id.* ¶ 22 (quoting UJI 14-604 NMRA). The Court determined that this standard will more closely achieve the legislative purpose "to punish conduct that creates a truly significant risk of serious harm to children." *Chavez*, 2009-NMSC-035, ¶ 22.

**{9}** In *Chavez*, our Supreme Court set forth factors for the courts to consider in determining "whether the risk created by an accused's conduct is substantial and foreseeable." *Id.* ¶ 23. One factor is the gravity of the risk, which "serves to place an individual on notice that his conduct is perilous, and potentially criminal." *Id.* A second factor is whether the defendant's conduct violates a separate criminal statute, which bolsters the endangerment charge, *see id.* ¶ 31, because "the Legislature has defined the act as a threat to public health, safety, and welfare." *Id.* ¶ 25; *see State v. Gonzales*, 2011-NMCA-081, ¶ 17, 150 N.M. 494, 263 P.3d 271 (listing criminal behavior as a factor in *Chavez*), *aff'd* No. 33,077, 2013 WL 1339598 (Mar. 28, 2013). A third factor, "although no longer the determinative factor," is the likelihood of harm, which informs the court of the foreseeability of the risk when evaluating its magnitude. *Chavez*, 2009-NMSC-035, ¶ 26. Also relevant is "the length of time that these conditions are allowed to exist and the amount of supervision in the home[, which] are certainly factors that can increase or mitigate the degree of risk involved." *Id.* ¶ 36. The *Chavez* Court indicated that the state must present specific evidence, including scientific or empirical evidence, connecting the circumstances to a substantial and foreseeable risk of harm, where it is not readily apparent in the record. *See id.* ¶ 37.

**Defendant's Arguments**

**{10}** Defendant contends that the State did not present any evidence that any of the four children were actually endangered by the drugs, guns, or other conditions of the house while they were present in the home. Defendant points out that the State presented no expert or scientific testimony as required by *Chavez* and that the State relied solely on the observations and opinions of two probation officers and a detective. Defendant emphasizes that the children tested negative for methamphetamine and that the State failed to have anything in the house tested and failed to conduct any investigation beyond their observations of the residence at a time when the children were not home.

**Standard of Review**

**{11}** When reviewing a sufficiency of the evidence claim, we conduct a two-part test. First, "we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. Then we must "make a legal determination of whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *State v. Apodaca*, 118 N.M. 762, 766, 887 P.2d 756, 760 (1994) (internal quotation marks and citation omitted). The question for us on

appeal is whether the district court's "decision is supported by substantial evidence, not whether the [district] court could have reached a different conclusion." *In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 15, 121 N.M. 562, 915 P.2d 318. We emphasize that we do not consider the merit of evidence that may have supported a different result. *See State v. Kersey*, 120 N.M. 517, 520, 903 P.2d 828, 831 (1995). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted).

**Analysis**

**{12}** We agree with Defendant that the State did not conduct a thorough investigation into the possible effects the household environment may have had on the children or the length of time the household was in that state, and it did not test anything in the house. Thus, the State did not present the clearest case of child endangerment that it could have presented. We are persuaded, however, that the dangerousness of certain conditions in the household were apparent and did not require the type of scientific or empirical testimony that was required in *Chavez* to connect the household conditions to the risk of harm they posed to the children. *See* 2009-NMSC-035, ¶¶ 29, 35, 37-40 (holding that the risk and degree of likelihood of disease or illness caused by the presence of rodent droppings or parasites is a matter of science that should be established by empirical and scientific evidence). The presence of loaded firearms and toy guns, including at least one gun replica that was nearly identical to the loaded firearms, and with which the teenager and the five-year-old triplets were permitted to play, presented an obvious and serious risk of harm. Also concerning is Defendant's and Ms. Schaaf's extended use of methamphetamine, which is a crime that bolsters the endangerment charge. In addition, Defendant admitted to using methamphetamine in common areas of the home while the children were at home, and he left paraphernalia strewn about the bedroom and the backyard. *See id.* ¶ 25 (stating that the violation of another criminal statute can be useful to an endangerment analysis because it is a "legislative declaration of harm"). The danger posed by the loaded firearms, particularly in the vicinity of gun replicas, the use of methamphetamine at the residence, and the drug paraphernalia strewn about is increased by their presence in the midst of extreme clutter. Also informing our decision about the graveness of the risk to the children is the young age of the triplets and the number of the children in the home. Another important factor is Defendant's recognition and admission regarding the serious nature of the real risks of harm present in the house and the potential injury or death that the children were exposed to there. The current case is unlike *Chavez* where the alleged endangerment was based on a filthy house alone with only speculative and vague dangers. *See id.* ¶¶ 27, 43. Instead, the endangerment here arose from a "combination of risks," *id.* ¶ 30, that together were readily apparent and gravely dangerous.

**{13}** We agree with Defendant that the problem we face in this case is whether the evidence sufficiently proved that the children were actually exposed to the dangerous conditions in the home, similar to the concerns our Supreme Court addressed in *State v.*

5

*Trossman*, 2009-NMSC-034, ¶¶ 22-24, 146 N.M. 462, 212 P.3d 350. In *Chavez*, the Court acknowledged that "there are many situations that may not produce a strict mathematical probability of harm, but nevertheless endanger a child." 2009-NMSC-035, ¶ 20. The *Chavez* Court suggested that where there is a showing of a "very real and unacceptable risk of harm," a lesser probability of harm may be needed to show criminal child endangerment. *Id.* Thus, "neither probability nor possibility provides an accurate, universal description of legislative intent." *See id.* ¶ 21. Our Supreme Court has emphasized that we should view the evidence as a whole and refrain from parsing out and evaluating individual pieces of evidence to determine whether a rational fact finder could draw reasonable inferences that the danger was accessible to the children and that the children would come in contact with the danger. *See State v. Graham*, 2005-NMSC-004, ¶¶ 13-14, 137 N.M. 197, 109 P.3d 285. Our examination of whether there was sufficient evidence from which the fact finder could assess the probability that the children were exposed to these hazards is informed further, in part, by Defendant's and Ms. Schaaf's use of methamphetamine for three days without sleep. *See Chavez*, 2009-NMSC-035, ¶ 43 (noting a distinction between a filthy, unsafe home environment that would merit civil action and a situation that could be criminally prosecuted where, for example, the "parents struggled with addiction and the children suffered as a result"). Based on the analysis below, we hold that the State presented sufficient evidence from which the fact finder could have reasonably determined that the children were exposed to an unacceptable level of hazardous conditions and that it was highly probable that the children were in contact with them.

**{14}** In *Trossman*, our Supreme Court held that there was insufficient evidence of child endangerment because the state failed to prove the actual presence of the child in the home during the time in question under conditions that could have endangered his life or health. 2009-NMSC-034, ¶ 22. In that case, police found legal household chemicals in the home that could each be dangerous, and together they were most likely used for methamphetamine production, but they were not stored in a manner that would endanger a child. *See id.* ¶ 23. Although there was evidence that methamphetamine production takes only six to eight hours, there was no evidence regarding when or how often it took place in that house. *See id.* Also, there was no evidence that the house was contaminated, and no methamphetamine was found there. *See id.* Although there was undisputed evidence that the child normally lived at the house, the evidence did not show when the child was present in the home, but the evidence did show that child was not present the night before the police arrived. *See id.* ¶ 22. The Court observed that "[p]roof of child endangerment is sufficient for a conviction if a defendant places a child within the zone of danger and physically close to an inherently dangerous situation." *Id.* ¶ 20 (alteration in original). The Court found insufficient evidence, stating that the evidence did not place the child at the house under dangerous conditions nor did it "suggest[] that hazardous conditions must have been ongoing in such a way that the jury could have judged the probability that the child must have encountered them at some point." *Id.* ¶ 24.

**{15}** In contrast, in the current case, it was not disputed that the children consistently lived at the house, that they were there the night and morning before the officers arrived, and that

6

they were coming home soon after the officers' visit to the home. The evidence suggested that amidst Defendant's and Ms. Schaaf's extended methamphetamine use, Defendant took the eldest boy to school for early practice before the triplets left and that either Defendant or Ms. Schaaf took the triplets to the bus stop that morning for school. As a result, there was sufficient circumstantial evidence to infer that the children's living conditions constituted a prolonged zone of imminent danger, and it was reasonable for the fact finder to conclude that the children were in contact with these hazardous conditions.

{16}    Relevant to the State's showing of a prolonged zone of danger, there was evidence that another person using methamphetamine at the house left behind the syringes, and the officers found them open on the bed a day after they had been used. Also, in his statement to police about the firearms, Defendant made a distinction between the secured and unsecured firearms in the master bedroom. Defendant stated that two guns were kept in the lockbox that was locked almost all the time except when he was going out somewhere and needed them. He stated that the other two firearms were for home security purposes because they had experienced some problems, suggesting that those loaded firearms were unsecured regularly, as they were when the officers were present. There was testimony that it was common for all the children to go through the master bedroom to go play outside because it was the only way to access the backyard. Also, a probation officer testified that the extent to which the home appeared to be "unlivable" suggested that this condition of the home was ongoing. *See Chavez*, 2009-NMSC-034, ¶ 36 (stating that the length of time that the hazardous conditions are permitted to exist can increase the degree of risk); *Trossman*, 2009-NMSC-034, ¶ 24 (stating that in the absence of direct evidence placing the child in the home under the hazardous conditions, there should be evidence that those conditions existed for so long that the fact finder could find that "the child must have encountered them at some point"). Given the facts that the children played with toy guns that replicated the real guns in the home, they had regular access to the master bedroom with unsecured, loaded firearms, and the room was extremely cluttered, we believe that the children were likely to encounter a serious and unacceptable danger.

{17}    We also consider the supervision of the children under these conditions. *See Chavez*, 2009-NMSC-035, ¶ 36 (explaining that the amount of supervision in the home "can increase or mitigate the degree of risk involved"). Although there was no expert testimony about the effects of the type of extended use of methamphetamine that Defendant and Ms. Schaaf engaged in, it is reasonable to infer that their judgment was poor and their supervision of the young children around the many hazards in the home was impaired. These inferences are supported by the following: Defendant and Ms. Schaaf permitted the entire household to be in an unlivable state; they left numerous dangers and inappropriate items strewn about the house and in the backyard; their unkempt appearance and behavior when the officers arrived, which occurred soon before the children's expected arrival, indicated their recent methamphetamine use; and they were unable to conceal the signs of their methamphetamine use, drug paraphernalia, or firearms from view of the officers, even where they seemed to take the time to do so before answering the door and were under threat of arrest. Viewed as a whole, the evidence supports a rational inference that their judgment was highly impaired

7

in the presence of substantial risks of harm to the children and that Defendant had not secured and would not secure the substantial risks from the children. *See Graham*, 2005-NMSC-004, ¶¶ 13-14 (emphasizing the inappropriateness of parsing out the testimony and individual pieces of evidence in a divide-and-conquer approach in reviewing the sufficiency of the evidence to support a child endangerment charge). We also note that Defendant presented the fact finder with no evidence to counter these reasonable inferences. *See id.* ¶ 13 (discussing the need to avoid indulging in hypotheses consistent with innocence).

**{18}** In sum, drawing from the combination of serious risks apparent in the children's living environment, we hold that the State provided sufficient evidence to prove that the children were exposed to an ongoing and pervasive zone of imminent danger in such a manner that, with Defendant's and Ms. Schaaf's compromised state, the risk of harm to the children was so grave and probable that it constituted criminal child endangerment.

**CONCLUSION**

**{19}** For these reasons, we affirm Defendant's conviction.

**{20}** **IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Judge**

**WE CONCUR:**

_____
**TIMOTHY L. GARCIA, Judge**

_____
**J. MILES HANISEE, Judge**

**Topic Index for *State v. Schaaf*, No. 31,779**

**APPEAL AND ERROR**
Standard of Review
Substantial or Sufficient Evidence

**CRIMINAL LAW**
Child Abuse and Neglect
Controlled Substances

**CRIMINAL PROCEDURE**

8

Expert Witness