This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                    **No. 31,911**

**MICHELLE CHARLEY,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Robert M. Schwartz, District Judge**

Gary K. King, Attorney General
Margaret E. McLean, Assistant Attorney General
Joel Jacobsen, Assistant Attorney General
Santa Fe, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Sergio J. Viscoli, Assistant Appellate Defender
Santa Fe, NM

Sue Anne Herrmann, Adjunct Professor of Law
Santa Fe, NM
Mark Cox, Practicing Law Student
Christina Looney, Practicing Law Student
Ian Stoker, Practicing Law Student
Katie Wilson, Practicing Law Student
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**ZAMORA, Judge.**

**{1}** The memorandum opinion previously filed in this matter on April 17, 2014, is hereby withdrawn, and this memorandum opinion is substituted therefor, to reflect additional counsel and practicing law students appearing for Defendant.

**{2}** Michelle Charley (Defendant) appeals her convictions (and corresponding sentences) for intentional child abuse and negligent child abuse by endangerment pursuant to NMSA 1978, Section 30-6-1(D)(1) (2009), and for child abandonment pursuant to NMSA 1978, Section 30-6-1(B) (2009). She raises three issues, arguing that: (1) the warrantless entry to her home violated her constitutional rights against unreasonable search and seizure, (2) the jury instructions, individually, and collectively, misled and confused the jury resulting in fundamental error, and (3) the State failed to present evidence necessary to support her convictions for child abuse by endangerment and child abandonment. We conclude that there was insufficient evidence to support Defendant's convictions. Accordingly, we do not reach the other issues raised by Defendant. We therefore reverse.

**BACKGROUND**

{3}     In August 2010, Defendant was a client at Crossroads for Women (Crossroads), an outpatient program for women with mental health and substance abuse issues. Crossroads' staff worked with Defendant to help her overcome alcohol abuse. As part of her involvement with the program, Defendant received assistance with relapse prevention, one-on-one and group parenting training, life-skills training, employment training, and assistance with housing. Crossroads co-leased an apartment with Defendant and assisted her by paying a portion of her rent. Defendant lived in the apartment with her six-year old daughter A.R., her six-month old son, J.C., and her thirteen-year old nephews, A.C. and B.C. Crossroads' policy was to keep a key to the apartment so its staff could check on the status of the client if needed.

{4}     Defendant began in the inpatient program, Maya's Place, in December 2007 and subsequently transitioned into Crossroads. Since that time, Defendant has maintained regular contact with Andrea Atencio, a Crossroads family specialist, with whom she met weekly, and with Sheila Ciminera, her case manager, with whom she met weekly and spoke to several times each week.

{5}     On August 31, 2010, Ms. Ciminera called Defendant in the early afternoon and Defendant appeared to be slurring her speech. Ms. Ciminera asked Defendant if she was intoxicated and Defendant confirmed that she was. Ms. Ciminera asked where six-month old J.C. was and Defendant said he was there with her, her boyfriend, and another woman. Ms. Ciminera then told Defendant she was going to come over. Ms.

Atencio was also concerned because Defendant had missed an early afternoon appointment with her. Ms. Atencio and Ms. Ciminera met with their clinical director, Larrea Lavoscia and their executive director, K.C. Quirk. The group decided that Ms. Ciminera and Ms. Lavoscia would go to the apartment to conduct a welfare/status check on Defendant and J.C., as it is customary for Crossroads to conduct well-checks whenever a client relapses. Ms. Atencio met them at the apartment.

{6} At that time, Defendant's car was not in the parking lot. There was no one present at the apartment when Ms. Ciminera, Ms. Lavoscia, and Ms. Atencio arrived. Inside the apartment the women observed open containers of alcohol and an unopened case of beer. Defendant had left her cell phone in the apartment. This was concerning and unusual, as Defendant always had her cell phone and it was the only means of communication Crossroads had with her. Ms. Ciminera, Ms. Lavoscia, and Ms. Atencio waited for a while inside the apartment, then decided to proceed with the family emergency plan. The family emergency plan specified that if Defendant was unable to provide care for her children, Crossroads would: (1) notify the emergency contact (Defendant's mother), (2) receive Defendant's children, and (3) contact the Children, Youth & Families Department (CYFD).

{7} Ms. Ciminera called Defendant's mother. Ms. Atencio left a note for Defendant advising her that she would be taking A.R., A.C., and B.C. to the Crossroads office and if Defendant did not contact her by five o'clock that afternoon, CYFD would be

notified. Defendant was well aware of this protocol. A.C and B.C. were walking home as Ms. Atencio was leaving the apartment. She took them with her and went to pick up A.R. from school. At approximately four o'clock, Ms. Atencio arrived at Crossroads with all three children. The children did homework and were fed. Ms. Atencio and Ms. Ciminera had still not heard from Defendant. As a result, they called CYFD because they were concerned that no one knew where the Defendant or J.C. were. The CYFD representative advised Ms. Ciminera that CYFD would contact the police.

{8} Police officers Nick Wheeler (Officer Wheeler) and Joey Tosta (Officer Tosta) were dispatched to Crossroads where they spoke with Ms. Ciminera. Ms. Ciminera explained the nature of the Crossroads program to the officers, recounted the events of the day, and expressed her concern for Defendant and J.C. The officers felt it was necessary to go to Defendant's apartment to conduct a welfare check on both Defendant and J.C. Ms. Ciminera gave the officers Defendant's address as well as a description of Defendant's vehicle.

{9} When the officers arrived at Defendant's apartment complex, they identified her vehicle parked outside. Officer Wheeler looked inside the vehicle and observed several empty beer cans, as well as full containers of beer. He also observed an infant car seat. This situation was considered a high priority situation by the officers, based

5

on their standard operating procedure and in light of the information provided that Defendant was intoxicated and the infant was in her care.

{10} The police officers knocked numerous times on the front door and announced several times their presence and their intention to conduct a welfare check on those inside the apartment, but got no response. Officer Tosta found the door to be unlocked. Based on the information they had, Defendant's vehicle in the parking lot, and Defendant's intoxication, the decision was made to open the unlocked door but not yet enter the apartment to check on the safety of those inside the apartment. Again, the officers, standing at the open front door, announced several times their presence and that they were there to conduct a welfare check, and again there was no response.

{11} At that point, the officers decided to enter the apartment to make sure everything was okay. Inside, there were beer cans on the coffee table and there were multiple containers of beer on the counters and kitchen table, but there was no one present. The officers proceeded through the apartment checking each room, finding no one. The officers approached a closed bedroom door and again knocked several times, announced their presence and intention to conduct a welfare check, and again, no response.

{12} They opened the door to find Defendant was in the room sitting on the edge of the bed staring at the ground, a male was standing facing the door and looking at the ground, and J.C. was lying in the middle of the bed. Suddenly, Defendant became

6

alarmed and upset by the officers' presence in her room. She became belligerent, yelling and cursing at the officers. Concerned for safety, Officer Wheeler placed Defendant in handcuffs and escorted her to his car so that he and Officer Tosta could conduct an investigation and check the status of J.C.

{13} An examination of J.C. revealed that his diaper had overflowed. Fecal matter from the diaper was partially dried on most of J.C.'s body, including his face. Officer Wheeler observed feces around J.C.'s mouth, as well as inside his eyes and ears. Officer Wheeler considered calling a field investigator to the scene to document J.C.'s condition, but, concerned that a field investigator may not arrive for hours, Officer Wheeler decided to take pictures of J.C. with his cell phone camera and to clean the infant up. The officers gave J.C. a bath and dressed him in clean clothing. Based on the fact that J.C. had feces in his mouth and eyes, Officer Wheeler made the decision to arrest Defendant. The officers packed a bag for J.C., called CYFD, and called Crossroads to request that someone with an infant car seat pick J.C. up. Ms. Atencio returned to Defendant's apartment, picked up J.C., and took him to Crossroads where she and the officers met with a caseworker from CYFD.

{14} Defendant was charged with three alternative counts of child abuse as to J.C.: (1) child abuse (intentionally caused); (2) child abuse (negligently caused); and (3) child abuse (negligently permitted). She was also charged with three counts of child abandonment, one count each as to A.R, A.C, and B.C. At trial Defendant moved for

7

directed verdict. The district court granted the motion as to the charges of child abandonment of A.C. and B.C. The court denied the motion for a directed verdict as to the alternative charges of child abuse of J.C. and the charge of child abandonment of A.R. Defendant was convicted of intentional child abuse, negligent child abuse by endangerment of J.C., and child abandonment as to A.R.

## DISCUSSION

### I.      Defendant's Convictions Were Not Supported By Sufficient Evidence

{15}      When reviewing a sufficiency of the evidence claim, we must determine whether the evidence "could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *State v. Schaaf*, 2013-NMCA-082, ¶ 11, 308 P.3d 160 (internal quotation marks and citation omitted). In making this determination, we "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Id.* (internal quotation marks and citation omitted). Where a decision is supported by substantial evidence, we will affirm. *See id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted).

### A.      Child Abuse of J.C. By Endangerment

{16} Section 30-6-1(D)(1) (2009) defines child abuse, in relevant part, as "knowingly, intentionally[,] or negligently, and without justifiable cause, causing or permitting a child to be[ ] . . . placed in a situation that may endanger the child's life or health[.]" Even though this statute could be interpreted "broadly to permit prosecution for any conduct, however remote the risk, that *may* endanger [a] child's life or health[,]" our Supreme Court has held that criminal prosecution is "reserved for the most serious occurrences, and not for minor or theoretical dangers." *State v. Chavez*, 2009-NMSC-035, ¶ 16, 146 N.M. 434, 211 P.3d 891 (alterations in original) (internal quotation marks and citation omitted). Criminal prosecution under the endangerment statute requires a showing that the "defendant's conduct created a *substantial and foreseeable* risk of harm." *Id.* ¶ 22 (internal quotation marks and citation omitted). This standard achieves the legislative purpose of the statute by punishing conduct that "creates a truly significant risk of serious harm to children." *Schaaf*, 2013-NMCA-082, ¶¶ 8, 11 (internal quotation marks and citation omitted).

{17} In determining whether the risk created by an accused's conduct is substantial and foreseeable, relevant considerations may include:

> [T]he gravity of the risk, which serves to place an individual on notice that his conduct is perilous, and potentially criminal[;] . . . whether the defendant's conduct violates a separate criminal statute, which bolsters the endangerment charge[;] . . . the likelihood of harm, which informs the court of the foreseeability of the risk when evaluating its magnitude[;] . . . the length of time that the conditions are allowed to exist[;] and the amount of supervision in the home[.]

*Id.* ¶ 9 (internal quotation marks and citation omitted). The length of time the conditions existed and the level of supervision are factors that can increase or mitigate the degree of risk involved. *Id.*

**{18}** "[T]he [s]tate has the burden to identify the specific dangers posed [to the child] . . . and to present evidence to demonstrate that such . . . conditions endangered the child." *Chavez*, 2009-NMSC-035, ¶ 27. "[T]he state must present specific evidence, including scientific or empirical evidence, connecting the circumstances to a substantial and foreseeable risk of harm, where it is not readily apparent in the record." *Schaaf*, 2013-NMCA-082, ¶ 9.

**{19}** In this case, the State presented the cell phone camera photographs that Officer Wheeler took of J.C. (in which fecal matter was not visible on J.C.'s face or in his ears) testimony by both Officer Wheeler and Officer Tosta as to J.C.'s condition, and the opinions of both officers that J.C.'s condition was not healthy. The State contends that this evidence was sufficient to show a substantial and foreseeable risk of harm to J.C.'s health because fecal matter on the skin and in the facial orifices undoubtedly poses a health risk to a baby. We are unpersuaded.

**{20}** J.C.'s condition was certainly concerning and created a degree of risk to his health, particularly because J.C. was an infant who was unable to avoid or tend to his own mess. However, the question before us is whether his condition created a substantial and foreseeable threat of serious harm. As our Supreme Court has

10

recognized, not every risk of harm rises to the level of felony child endangerment. *See Chavez*, 2009-NMSC-035, ¶ 35.

{21}	It is not uncommon for an infant to produce a mess that exceeds the capacity of a diaper. It is also not uncommon for infants to move around and even to play in the messes they have made. While it is desirable to tend to such messes promptly, especially since human feces can be unsanitary, there was no evidence presented to show that every exposure to human feces will result in serious illness. "The risk of serious disease or illness is a matter of science and can be established with empirical and scientific evidence." *Id*. ¶ 40.

{22}	Here, the State did not offer any scientific evidence regarding the risk of serious disease or illness. The material on J.C. was not laboratory tested to determine if it was fecal matter, or to determine the presence of disease or harmful bacteria. Assuming it was a dangerous matter, the State did not present testimony from a health professional explaining the scientific nexus and degree of likelihood regarding J.C.'s condition and specific diseases or other significant threats to his welfare. *See id.* ("[O]ur juries deserve more evidentiary assistance, particularly when the risks are based on matters of science, to help them decide whether the threat of serious illness is significantly greater in the particular [situation] in question."). The only evidence linking J.C.'s condition to a health risk was the officers' opinion testimony that J.C.'s condition was "not healthy." This evidence is not sufficient to establish with any

particularity the gravity of risk to J.C or the likelihood that his condition would result in serious harm.

{23} Furthermore, the State did not present evidence that Defendant's conduct violated a separate criminal statute or that there was a lack of supervision in the home, and the record is largely silent regarding the length of time J.C. was in the condition in which the officers found him. While Officer Wheeler did testify that some of the feces on J.C. had dried, that testimony was insufficient to establish the length of time that J.C. had been in that state. Without additional evidence, the risk of harm established by the State was only speculative. Therefore, we conclude that the evidence presented was insufficient to show that Defendant's conduct presented a substantial and foreseeable risk to J.C.'s health and was insufficient to support her conviction of negligent or intentional child abuse by endangerment.

**B.      Abandonment of A.R.**

{24} Failure to pick up a child after school does not rise to the type of abandonment contemplated by New Mexico statutory law. "Abandonment of a child consists of the parent, guardian[,] or custodian of a child intentionally leaving or abandoning the child under circumstances whereby the child may or does suffer neglect." Section 30-6-1(B).

{25} In this case, Crossroads' staff testified that Defendant's family emergency plan provided that in the event Defendant was unable to care for A.R, Crossroads' staff

12

would pick A.R. up from school and notify CYFD. Crossroads' staff were designated as the emergency contacts with A.R.'s school. The school also kept a copy of the release Defendant signed permitting Crossroads' staff to pick A.R. up from school. The purpose of the family emergency plan was to ensure that A.R. would be cared for. Defendant knew that if she did not pick A.R. up from school, Crossroads would be contacted and would pick A.R. up. Additionally, on August 31, 2010, when Crossroads' staff elected to activate the family emergency plan, they left Defendant a note advising her that the family emergency plan had been activated and that A.R. would be picked up and taken to the Crossroads office. A.R. was in fact picked up, fed and given help with her homework. Because A.R. did not suffer neglect and was not placed in a situation where she may have suffered neglect, we conclude that the evidence is insufficient to show that Defendant intentionally left or abandoned A.R.

{26} To the extent the State argues that the only reason Crossroads would notify CYFD that Defendant had not picked A.R. up would be to report abandonment, we disagree. The record simply does not support this assertion. While Crossroads' staff did testify that CYFD notification is part of its protocol, no explanation appears in the record as to why. It is possible that in some circumstances Crossroads may contact CYFD to report abandonment or abuse, but, it is also possible that a family's prior involvement with CYFD requires CYFD to be notified upon the activation of the family emergency plan. In this case, the record is silent to the particular reason that

13

CYFD notification was included in Defendant's family emergency plan. We are not persuaded that the only reason for CYFD notification would have been to report abandonment.

**CONCLUSION**

{27}    For the foregoing reasons, we reverse Defendant's convictions for child abuse by endangerment and child abandonment. We need not address Defendant's remaining contentions of error.

{28}    **IT IS SO ORDERED.**


_____
**M. MONICA ZAMORA, Judge**

**WE CONCUR:**


_____
**CYNTHIA A. FRY, Judge**


_____
**J. MILES HANISEE, Judge**