This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                              **No. 34,423**

**MICHAEL HERNANDEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James Waylon Counts, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Josephine H. Ford, Assistant Appellate Defender
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**SUTIN, Judge.**

{1} Defendant Michael Hernandez was convicted by a jury of two counts of possession of a controlled substance (heroin and methamphetamine) in violation of NMSA 1978, Section 30-31-23 (2011), and child abuse negligently caused (no death or great bodily harm) on an endangerment theory in violation of NMSA 1978, Section 30-6-1(D)(1) (2009). On appeal, Defendant argues that there was insufficient evidence to convict him of negligent child abuse by endangerment. He also argues that the proper approach to addressing his issues would have been civil intervention, as opposed to criminal prosecution. We agree that there was insufficient evidence to convict Defendant of negligent child abuse by endangerment, and we therefore reverse. Because we reverse this criminal conviction on sufficiency grounds, we need not address Defendant's civil intervention argument.

**BACKGROUND**

{2} On November 20, 2012, Kyle Graham (formerly a patrol deputy/agent with Otero County Sheriff's Office Narcotics Enforcement Unit, and at the time of trial, an officer with the Ruidoso Police Department), Border Patrol Agent Timothy Huffman, and David Hunter (formerly an undersheriff, and at the time of trial, a detective) were doing surveillance at 203 Virginia in Alamogordo, New Mexico. As they were monitoring the residence, Officer Graham witnessed a white Chrysler pull up to the house and saw Defendant approach the vehicle and then return to the house.

Thereafter, George Hernandez, Defendant's brother, came out of the residence and got in to the front passenger seat of the Chrysler. At that point, law enforcement executed a search warrant for the residence.

{3}     George Hernandez and a female who had been in the Chrysler were detained, and Undersheriff Hunter entered, announced "search warrant," and cleared the residence to make sure no one else was inside. After Undersheriff Hunter cleared the residence, Officer Graham entered the residence and found that the back door was open, as if someone had just left. At trial, Agent Huffman agreed that it looked as though someone had just left the house prior to law enforcement's entry, and he testified there were tracks leading from the back of the house to an alley. About a block and a half down the alley, Agent Huffman saw that his fellow agents had detained Defendant, another man, and a little boy who looked to be about seven or eight years old. Agent Huffman testified that the boy, who was Defendant's son, was "a little guy" about three or four feet tall.

{4}     While executing the search warrant, law enforcement searched the entire residence and found illegal narcotics, money, and a pipe in a drawer of a wicker dresser in the far northeast bedroom. Officer Graham testified that the house was very cluttered with "a lot of items, a lot of . . . knicknacks" throughout, including in the bedroom where narcotics were found. In the bedroom he also found a cell phone and

a name tag with Defendant's name on it. As to the narcotics found in the dresser, Officer Graham testified that he found thirteen individually foil-wrapped packets of heroin, which had been wrapped in three separate plastic bundles contained within a brown zippered bag located in a drawer of the dresser. He also testified that he found a baggie with a white crystalline substance in the same drawer in the dresser. At trial, the State elicited testimony from forensic scientists that the substance in the foil-wrapped packets or "bindles" tested positive for heroin and the crystalline substance in the baggie contained methamphetamine.

{5}    Officer Graham testified that, while searching the northeast bedroom, he saw a child's tray with food on it, a backpack with school work, toys, and a Nintendo DS that evidenced a child's presence in that room. He testified that the tray was colorful and was decorated with cartoon characters, and the food on the tray looked as though someone was eating or had just finished eating. Officer Graham explained that the tray was located in the same room as the dresser containing the narcotics and was "very close" to the dresser containing the narcotics, but did not give an estimated distance. Officer Graham testified that he did not actually see a child in the bedroom, but he assumed that the child had been using the tray because there were cartoon figures on it. Officer Graham never saw a child, and he did not know the height of the child that other officers had encountered. He was unable to opine as to whether the child would

4

have been able to lean over and look in the drawer or whether the child had ever touched the drawer where the narcotics were located. He did not measure the height of the dresser.[1]

{6} Defendant testified at trial that he was staying at his mother's house at 203 Virginia to assist in caring for his mother with dementia. George Hernandez was also staying at the house at the time of the search, and Defendant testified that they both used the northeast bedroom. Defendant's son was living with Defendant's wife at another home in Alamogordo. Defendant testified that his son was not sleeping at Defendant's mother's home. Defendant also testified that his son did not visit the house very much, and his son was not living in the bedroom shared by Defendant and George. He denied that his son had unsupervised access to the room and testified that his son had only been in his care for about an hour when law enforcement arrived. As to the tray noted by Officer Graham, Defendant testified that he saw George eating a

---

[1] In its brief, the State describes the dresser as being "small" and "approximately 30 inch[es] high[.]" However, the State provides no citation to the record where testimony to that effect was elicited. Where a party fails to cite any portion of the record to support its factual allegations, appellate courts need not consider the argument. *See Santa Fe Exploration Co. v. Oil Conservation Comm'n*, 1992-NMSC-044, ¶ 11, 114 N.M. 103, 835 P.2d 819; *see also* Rule 12-213(A)(3), (B) NMRA (requiring appellate briefs to contain, in relevant part, "citations to the record proper, transcript of proceedings or exhibits supporting each factual representation"). Additionally, as noted earlier, Officer Graham specifically stated he did not measure the dresser.

sandwich in the bedroom just before the search and stated the whole family used that tray. Defendant admitted to purchasing the heroin found by law enforcement, but he testified that he had the heroin in his possession for only about two hours before his son arrived. He testified that he had the methamphetamine in his possession for about a day.

**DISCUSSION**

**Standard of Review**

{7}     Claims of insufficient evidence are reviewed for substantial evidence. *State v. Chavez*, 2009-NMSC-035, ¶ 11, 146 N.M. 434, 211 P.3d 891. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Trujillo*, 2002-NMCA-100, ¶ 8, 132 N.M. 649, 53 P.3d 909 (internal quotation marks and citation omitted). "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Garcia*, 1992-NMSC-048, ¶ 26, 114 N.M. 269, 837 P.2d 862 (alteration, internal quotation marks, and citation omitted). We view the evidence in "the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We "[do] not weigh the

6

evidence or substitute [our] judgment for that of the fact[-]finder as long as there is sufficient evidence to support the verdict." *Chavez*, 2009-NMSC-035, ¶ 11 (internal quotation marks and citation omitted).

{8}     "To convict [the d]efendant of child abuse by endangerment, the [prosecution] had the burden of proving beyond a reasonable doubt that [he] caused a child to be placed in a situation that endangered his life or health and did so with reckless disregard for the safety of the child." *State v. Etsitty*, 2012-NMCA-012, ¶ 6, 270 P.3d 1277; *see* § 30-6-1(A)(3), (D)(1). Reckless disregard requires that Defendant "knew or should have known [his] conduct created a substantial and foreseeable risk, [he] disregarded that risk and [he] was wholly indifferent to the consequences of the conduct and to the welfare and safety of [the child]."[2] *See* UJI 14-604 NMRA (withdrawn April 3, 2015, current version at UJI 14-612).

**Child Abuse by Endangerment**

---

[2] We note that since Defendant's trial, a new Uniform Jury Instruction for child abuse not resulting in death or great bodily harm has been adopted. *See* UJI 14-612 NMRA (2015). The "child abuse instructions were substantially revised . . . to reflect amendments to the child abuse statute . . . and recent holdings of New Mexico's appellate courts" regarding the evaluation of "recklessness." *See* UJI 14-612 comm. cmt.; *see also State v. Consaul*, 2014-NMSC-030, ¶ 37, 332 P.3d 850 ("[W]hat has long been called 'criminally negligent child abuse' should hereafter be labeled 'reckless child abuse' without any reference to negligence.").

{9} "Child abuse by endangerment, as opposed to physical abuse of a child, is a special classification designed to address situations where an accused's conduct exposes a child to significant risk of harm, even though the child does not suffer a physical injury." *Chavez*, 2009-NMSC-035, ¶ 15 (emphasis, internal quotation marks, and citation omitted). The appellate courts have acknowledged that "[t]aken literally, our endangerment statute could be read broadly to permit prosecution for any conduct, however remote the risk, that may endanger a child's life or health." *Id.* ¶ 16 (alteration, emphasis, internal quotation marks, and citation omitted); *see also State v. Schaaf*, 2013-NMCA-082, ¶ 8, 308 P.3d 160 (same). However, this Court has already recognized a more narrow application of the endangerment statute that was adopted by our Supreme Court in *Chavez*, 2009-NMSC-035, ¶ 16, when we stated that "by making child endangerment a third degree felony, the Legislature anticipated that criminal prosecution would be reserved for the most serious occurrences, and not for minor or theoretical dangers." *Schaaf*, 2013-NMCA-082, ¶ 8 (internal quotation marks and citation omitted). *Schaaf* noted that criminal prosecution is only appropriate when the defendant's conduct creates "a substantial and foreseeable risk of harm." *Id.* (emphasis, internal quotation marks, and citation omitted). Our Supreme Court has explained that the "substantial and foreseeable risk of harm" standard satisfies the

legislative purpose "to punish conduct that creates a truly significant risk of serious harm to children." *Chavez*, 2009-NMSC-035, ¶ 22.

{10}     In determining "whether the risk created by an accused's conduct is substantial and foreseeable[,]" the *Chavez* Court outlined factors under which a defendant's conduct should be evaluated. *Id.* ¶ 23. The *Chavez* factors were concisely stated in *Schaaf*, 2013-NMCA-082, ¶ 9, as follows:

> One factor is the gravity of the risk, which serves to place an individual on notice that his conduct is perilous[] and potentially criminal. A second factor is whether the defendant's conduct violates a separate criminal statute, which bolsters the endangerment charge, because the Legislature has defined the act as a threat to public health, safety, and welfare. A third factor, although no longer the determinative factor, is the likelihood of harm, which informs the court of the foreseeability of the risk when evaluating its magnitude. Also relevant is the length of time that these conditions are allowed to exist and the amount of supervision in the home, which are certainly factors that can increase or mitigate the degree of risk involved.

(Alteration, internal quotation marks, and citations omitted.) "[T]he defendant's conduct must create a substantial and foreseeable risk of harm to an identified . . . child within the zone of danger[, and t]he risk cannot be merely hypothetical, as the child must be physically close to an inherently dangerous situation of the defendant's creation." *State v. Gonzales*, 2011-NMCA-081, ¶ 21, 150 N.M. 494, 263 P.3d 271. "[E]ndangerment of [a child] cannot be predicated on a child's mere proximity to a dangerous situation, but rather that the defendant's actions must place the child who

9

is endangered in the direct line of any danger so as to create more than a mere possibility of harm." *Id.* ¶ 25 (internal quotation marks and citation omitted).

**{11}** Although the specific facts in this case differ from previous New Mexico appellate cases involving child endangerment, we find *State v. Trossman*, 2009-NMSC-034, 146 N.M. 462, 212 P.3d 350, *State v. Graham*, 2005-NMSC-004, 137 N.M. 197, 109 P.3d 285, *State v. Garcia*, 2014-NMCA-006, 315 P.3d 331, and *Schaaf*, 2013-NMCA-082, to be particularly useful for comparison purposes because they involve instances where a child abuse charge was premised in part on actual or potential drug use or manufacturing by the defendant in a home with a child.

**{12}** In *Trossman*, 2009-NMSC-034, ¶ 1, the defendant appealed her conviction for negligently permitting child abuse by endangerment "after she was arrested in a house . . . where chemicals and equipment involved with methamphetamine production were found and the evidence suggested that her child lived there with her." In vacating the defendant's conviction, the Supreme Court stated its concern "with the lack of evidence that establishe[d] the presence of the child in the home" when "the dangerous situation occurred" and held that New Mexico law required "a greater showing of risk of harm" than was presented by the prosecution. *Id.* ¶¶ 2, 22-23, 25. The Court noted that although witnesses testified that some of the chemicals found in the house could be dangerous, there was no evidence that the "legal, household

chemicals were actually stored in a manner that could endanger a child in the house." *Id.* ¶ 23. Additionally, there was no evidence regarding when or how often methamphetamine production occurred in the house or that the house was actually contaminated. *Id.* Also, no methamphetamine was found in the house. *Id.* Viewing this evidence as a whole, the Supreme Court held that the prosecution "simply did not present any evidence to allow the jury to draw the specific inferences required for it to find endangerment." *Id.* ¶ 24.

{13}    In *Graham*, 2005-NMSC-004, ¶¶ 1, 9, 15, our Supreme Court affirmed the defendant's conviction for child abuse by endangerment. While executing a search warrant, officers found:

> crack cocaine, several plastic bags with marijuana, a marijuana pipe, and a hanging scale in a dresser drawer in the master bedroom. The officers also noticed rolling papers and marijuana residue, including seeds and stems, on top of a different dresser. Additionally, the officers found a marijuana roach on the living[]room floor in front of the sofa and a marijuana bud in a crib in the master bedroom. The officers also recovered a plastic sandwich bag with a small amount of marijuana just inside the front door on a table next to a fish tank. The officers saw two infants in the house and noticed that they were in diapers. The house was dirty and untidy, with soiled clothes on the floor throughout the house and unwashed dishes with old food on them.

*Id.* ¶ 2. The Court held that "[f]rom the evidence in the record, a rational jury could draw reasonable inferences that the marijuana was accessible to the children, that there was a reasonable possibility that the children would come in contact with the

marijuana, and that there was a reasonable possibility of danger to the very young children from ingesting the marijuana" and thus affirmed the defendant's conviction. *Id.* ¶¶ 14-15. Although *Graham* has not been overturned, we note that in *Chavez*, 2009-NMSC-035, ¶ 18, our Supreme Court stated that "the relevant conduct must create more than a 'possibility' of harm before it may be punished as a felony." In our analysis in this Opinion, we rely on the heightened standard articulated in *Chavez*.

{14}     In *Garcia*, 2014-NMCA-006, ¶ 1, this Court overturned the defendant's negligent child abuse by endangerment conviction. The defendant was convicted after her three-year-old son was found wandering outside of the defendant's apartment building at 2:00 a.m. crying, cold, and wearing only a dirty diaper. *Id.* ¶ 2. A neighbor found the child and returned him to the defendant's apartment. *Id.* ¶¶ 2-3. The defendant's apartment was filled with empty alcohol containers and other trash, and there was vomit on the floor. *Id.* ¶ 3. There was marijuana and a pipe in the apartment and a knife in one of the bedrooms. *Id.* The defendant was found in a bedroom in the apartment and ultimately admitted that she had gotten high and drunk. *Id.* ¶ 4. In overturning the defendant's conviction, this Court focused on the defendant's intoxication and stated that it "[saw] no evidence in the record which indicate[d] that [the d]efendant's act of falling asleep in her apartment bedroom intoxicated, or any subsequent failure to act, created a substantial and foreseeable risk of harm directed

12

to [the c]hild." *Id.* ¶ 10. While recognizing that the defendant was negligent in becoming intoxicated, this Court nevertheless "refuse[d] to hold that a defendant who gets intoxicated and falls asleep in the same apartment as her child, with nothing more, is criminally negligent." *Id.* ¶ 13.

{15} In *Schaaf*, 2013-NMCA-082, ¶ 1, this Court affirmed the defendant's conviction for negligent child abuse by endangerment not resulting in death or great bodily harm. In *Schaaf*, law enforcement, acting on an anonymous tip that illegal drug use was occurring at the defendant's residence, responded to the defendant's home and found that the defendant had been using methamphetamine for three days and had not slept. *Id.* ¶¶ 2-3.

> When [law enforcement] entered the home, they smelled smoke and an overwhelmingly strong chemical odor that made it hard to breathe and made one . . . officer's eyes water. They found a filthy house with three cats running around, cat urine and feces everywhere, and the entire house was littered with trash, rotten food, dirty dishes, and piles of dirty clothes. In the living room on a table by the front door, the officers found a plastic baggie containing thirteen pills, which [the d]efendant stated were antibiotics obtained from Mexico. The children's rooms and bathroom were in the same condition as the rest of the house: the beds had been urinated on; there was not adequate bedding; and there [was] . . . dried food embedded in the carpet[.]

*Id.* ¶ 4. The officers also found an open gun box on the floor of the master bedroom that contained loaded firearms, plus spare ammunition and magazines, as well as used "syringes on the bed, food, trash, cat feces, lighters, and dirty clothes all over the

13

floor, and pornographic DVDs strewn about the room." *Id.* ¶ 5. Officers found "toy gun replicas" in the master bedroom and at least one in the room of the defendant's five-year-old triplets. *Id.* ¶¶ 2, 5. At least one of the toy guns was a replica that was "indistinguishable from real guns in the house in its appearance, weight, and feel." *Id.* ¶ 5. There was drug paraphernalia in the backyard of the residence, along with children's toys, lighters, and a small propane torch. *Id.* ¶ 6. The defendant "admitted to smoking methamphetamine while the children were at home, both in the master bedroom and in common areas[.]" *Id.* ¶ 7. In affirming the conviction, this Court noted that the aforementioned conditions in the home were obviously and gravely dangerous, *id.* ¶ 12, and there was "sufficient evidence from which the fact[-]finder could have reasonably determined that the children were exposed to an unacceptable level of hazardous conditions and that it was highly probable that the children were in contact with them." *Id.* ¶ 13. *Schaaf* held that, under the facts of the case, it was reasonable to infer that the defendant's judgment was poor and the supervision of the children was impaired. *Id.* ¶ 17.

**Analysis**

{16}     Defendant challenges his conviction for negligently caused child abuse (no death or great bodily harm) that was based on an endangerment theory. Defendant asserts that the State failed to present substantial evidence establishing that he acted

14

with reckless disregard by ignoring a foreseeable risk to his son's safety. Defendant argues that the harm to his son was theoretical and not substantial. Specifically, he argues that although heroin is potentially dangerous to children in a home, the risk is theoretical if a child does not actually have access to the drugs. Defendant argues that the State relied on mere speculation that Defendant's son was present in the house under hazardous conditions. He explains that the house was cluttered but not with drugs or paraphernalia as in *Schaaf* and *Graham*. He further states that his son was just visiting the house when law enforcement arrived, there was no evidence that his son was left unsupervised in the room, or that he had actually been exposed to the drugs. Defendant testified that his son usually resided with his mother and was at the house for a short period while the child's mother attended an appointment. There was no evidence that his son knew the drugs were in the dresser drawer, and there was no evidence that he was interested in exploring the contents of the bag in which the drugs were found.

{17}     Defendant compares the facts in his case to *Trossman* and *Schaaf*, arguing that had he left drugs out in the open, as opposed to wrapped and inside a dresser drawer, the likelihood of harming a child would have been much higher. He argues that similar to *Trossman*, and unlike *Schaaf*, there was no evidence that his son was exposed to drugs over a long period of time. He argues that it was unclear who occupied the

15

bedroom at the time that the search warrant was executed and that there was no evidence that he had been using drugs that day. In addition to arguing that there was a lack of evidence regarding his son being unsupervised, Defendant argues that the evidence of the drugs being wrapped in several layers, placed in a zippered bag, and contained inside of a dresser drawer "is the opposite of acting with reckless disregard for his son's safety." He analogizes his precautions to a parent placing prescription drugs in a medicine cabinet.

{18}     In response to Defendant's arguments on appeal, the State argues that Defendant knew or should have known that placing illegal narcotics in a dresser drawer "presented an extremely serious and substantial risk of danger" to his son and that there was no redeeming justification for keeping the illegal drugs. In support of its argument, the State focuses on the obvious and inherent danger associated with placing a child near illegal narcotics. It analogizes the facts in this case to the facts in *Graham*, *Schaaf*, and a number of non-binding cases from other jurisdictions. The State also argues that the risk of harm to Defendant's son was not so remote that a reasonable person would not be on notice of the danger to the child or would not take action to avoid the risk. Finally, the State argues that because there was no sufficient justification for Defendant to be in possession of the illegal narcotics (unlike, for

16

example, prescription narcotics), Defendant's conduct was morally culpable and constituted recklessness.

{19} Although it does not appear that the State presented direct evidence of Defendant's lack of supervision of his son or evidence that his son spent a prolonged period of time in the room that housed the drugs, we indulge all reasonable inferences in favor of the verdict. *See Cunningham*, 2000-NMSC-009, ¶ 26. We hold that the jury could reasonably infer that Defendant's son was in the bedroom at some point and that he may or may not have been supervised constantly in the house. However, even indulging those reasonable inferences, we are faced with the following difficult question: whether the mere presence of hidden but harmful and illegal narcotics in the vicinity of the child, without additional evidence to support endangerment, is sufficient to sustain a negligent child endangerment charge. We hold that, under the facts of this case, the mere presence of illegal narcotics in Defendant's home did not support his conviction.

{20} Although it is undisputed that it is a crime to possess illegal narcotics, the other factors provided in *Chavez*—the gravity of the risk and the likelihood of harm—do not weigh in the State's favor in this case. Defendant's heroin was wrapped in individual foil packets, the packets were wrapped in plastic bundles, the bundles were contained in a zippered bag, and the bag was in a dresser drawer. Although not quite

as diligently concealed, the methamphetamine was in a bag which was also in the dresser drawer. The dresser was in a cluttered bedroom, among many other items. There was no evidence that Defendant's son had actually encountered the narcotics, or, despite the State's argument to the contrary, that Defendant's son, given his size and limited time at the residence, would foreseeably find the narcotics.

{21} The State did not elicit testimony that Defendant's son was in a zone of danger. *See Gonzales*, 2011-NMCA-081, ¶ 21. Although Officer Graham testified that he found a tray with cartoon characters "very close" to the dresser, the State failed to provide evidence that Defendant's son was "close to an inherently dangerous situation" for a prolonged period. *Id.*; *see Schaaf*, 2013-NMCA-082, ¶ 15 (holding that "there was sufficient circumstantial evidence to infer that the children's living conditions constituted a prolonged zone of imminent danger"). In fact, the only testimony regarding the length of time that Defendant had the narcotics in his possession was Defendant's testimony that he obtained the heroin a few hours before law enforcement arrived and that he obtained the methamphetamine the previous day. Additionally, Defendant testified that his son had only been at his house for about an hour when law enforcement arrived and that his son did not live there and did not visit very much. The State also failed to provide evidence that Defendant's son was unsupervised for an amount of time that would increase the child's risk of harm. In

18

fact, it appears that the only evidence presented by the State regarding a lack of supervision is an inference based on Officer Graham's testimony that the child was probably not supervised for the period when Defendant exited the residence to see who was in the white Chrysler. Even indulging all reasonable inferences that the child was unsupervised for that period of time, we decline to hold that briefly stepping out of one's home, while there is evidence that there was at least one other adult in the residence, in this case the child's uncle, constitutes a lack of supervision as contemplated by *Chavez*.

{22} We disagree with the State's view that the facts in this case are comparable to the facts in either *Graham* or *Schaaf*. As indicated earlier, in *Graham*, there was evidence of illegal drugs in the home and that those drugs, some of which were found on the floor and in a crib, were "easily accessible" to the defendant's children. 2005-NMSC-004, ¶ 14. Although our Supreme Court noted in *Graham* that there were drugs and paraphernalia in two dresser drawers in the defendant's home, that fact was not the sole or even primary evidence supporting the defendant's conviction. *See id.* ¶¶ 2, 14. In *Schaaf*, the prosecution similarly presented evidence of dangerous items, i.e., loaded firearms, toy replica guns, and paraphernalia, in areas where the children were permitted to play. 2013-NMCA-082, ¶ 12. The prosecution also presented evidence of other filthy living conditions and evidence that the defendant had been

using methamphetamine in common areas of the home while the children were home. *Id.* ¶¶ 2, 4, 12. In the present case, although Defendant admitted to being an addict, there was no evidence that he had used drugs in the house or that he used them around his son. Officer Graham testified that the house was cluttered, but did not indicate that the house was unclean or otherwise unliveable, as in *Schaaf*. Unlike the defendant in *Graham*, Defendant did not leave his drugs in an area that was easily accessible to his son. To the contrary, it appears he took affirmative steps to conceal his illegal narcotics in a dresser drawer.

{23} The facts in this case are comparable to *Trossman*, where the Supreme Court held that the mere presence of dangerous chemicals, absent evidence that the chemicals were stored in a way that could endanger a child, did not prove the risk of harm necessary to sustain a child endangerment conviction. 2009-NMSC-034, ¶¶ 23-24. We also conclude the facts in this case to be even less endangering than the facts in *Garcia*, where the defendant's child was found wandering outside while the defendant was found intoxicated, high, and asleep in her home. 2014-NMCA-006, ¶¶ 2-4. In this case, unlike *Garcia*, there was no evidence that Defendant was high or intoxicated or was otherwise inattentive to his son while his son was in his care. As in *Garcia,* the risk here was merely hypothetical, *see id.* ¶ 10, and based solely on the child's presumed proximity to hidden drugs. And under our case law, mere proximity,

20

without additional evidence, is not enough to sustain a conviction. *See Gonzales*, 2011-NMCA-081, ¶ 25 ("[E]ndangerment of children cannot be predicated on a child's mere proximity to a dangerous situation[.]").

**{24}** Because the State failed to prove that the harm to Defendant's son was substantial and foreseeable, that Defendant disregarded that risk, and that Defendant was wholly indifferent to the consequences of the conduct and to the welfare and safety of his son, we conclude that the evidence was insufficient to convict Defendant of child abuse negligently caused (no death or great bodily harm) on an endangerment theory.

**CONCLUSION**

**{25}** For the foregoing reasons, we reverse Defendant's conviction for child abuse negligently caused (no death or great bodily harm) and remand to the district court for proceedings consistent with this Opinion.

**{26}** **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**TIMOTHY L. GARCIA, Judge**

21

_____

**M. MONICA ZAMORA, Judge**